[Cite as *In re C.J.F.-O.*, 2024-Ohio-6056.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN RE: | : | |
| C.J.F.-O. | : | CASE NO. CA2024-08-106 |
| | : | O P I N I O N<br>12/30/2024 |
| | : | |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2022-0213

Mark W. Raines, for appellant, Mother.

Lyons & Lyons Co., L.P.A., and Kathleen Adams, for Father.

Michael T. Gmoser, Butler County Prosecuting Attorney, and John C. Heinkel, Assistant Prosecuting Attorney, for appellee.

Tracy A. Jackson, guardian ad litem.

**BYRNE, P.J.**

{¶ 1} Appellant ("Mother"), the biological mother of minor child "Jack,"[1] appeals

---

1. "Jack" is a pseudonym adopted for this opinion for the purposes of privacy and readability. *In re D.P.*, 2022-Ohio-4553, ¶ 1, fn. 1 (12th Dist.); *The Supreme Court of Ohio Writing Manual*, § 16, at 115 (3d Ed. 2024).

the decision of the Butler County Court of Common Pleas, Juvenile Division, granting permanent custody of Jack to the Butler County Department of Job and Family Services ("the Agency"). For the reasons outlined below, we affirm the juvenile court's decision.

## I. Factual and Procedural Background

{¶ 2} Jack was born on July 2, 2022, while Mother was incarcerated at the Ohio Reformatory for Women in Marysville. Before the child's birth, the Agency received a referral to evaluate an alleged father as a potential caregiver, anticipating that the child might not qualify for the prison nursery program. When that evaluation proved unsuccessful, Mother suggested her mother ("Grandmother"), who lived in California and was coming to Ohio, as an alternative caregiver. When the Agency contacted Grandmother, she said that she did not intend to move to Ohio but would take the baby with her and care for him in California. This interstate placement was not initially approved by either the Agency or the prison.

{¶ 3} On July 5, 2022, three days after Jack's birth, the Agency filed a dependency complaint in the Butler County Court of Common Pleas, Juvenile Division, and obtained emergency temporary custody. The Agency initially placed Jack in a foster home while pursuing expedited approval for kinship placement with Grandmother in California. On September 15, 2022, the juvenile court adjudicated Jack dependent. Mother's counsel was present for this hearing, but Mother, still incarcerated, declined to participate by telephone.

{¶ 4} At the dispositional hearing on September 28, 2022, the court adopted the Agency's case plan, which required Mother to complete various assessments and services when she was released from prison, with the goal of reunification. By this time, an Interstate Compact for the Placement of Children (ICPC) home study for Grandmother had been completed and she was approved to care for Jack in California. Despite

- 2 -

Mother's objection through counsel to her child going to California, Jack was placed with Grandmother on November 2, 2022, where he has remained throughout these proceedings.

{¶ 5} Mother was released from prison on December 18, 2022. Under the case plan, Mother then had to begin various assessments and services, including mental-health treatment, substance-abuse treatment, and psychological and domestic-violence assessments, and she was required to follow any recommendations. Mother also had to submit to random drug screens, comply with the terms of her parole, and obtain and maintain stable housing and income.

{¶ 6} In January 2023, Mother completed a Substance Abuse and Mental Illness (SAMI) assessment, which resulted in diagnoses of unspecified depressive disorder, unspecified anxiety disorder, and cocaine use disorder. The assessment recommended outpatient substance-abuse treatment, mental-health counseling, domestic-violence screening, and participation in an employment program to obtain a GED and a job. The Agency referred Mother for the recommended services. While Mother began services, her engagement with them proved inconsistent. She initially attended substance-abuse and mental-health treatment, but her attendance was spotty, and her service provider reported little engagement on Mother's part. It was reported that Mother denied any substance use, and ultimately, she was deemed not amenable to substance-abuse treatment.

{¶ 7} After failing to show for her first appointment, Mother eventually completed a psychological evaluation in October 2023 and was diagnosed with post-traumatic stress disorder, adjustment disorder with mixed anxiety and depressed mood, and stimulant use disorder. It was recommended that Mother attend trauma-informed mental health services, including individual therapy, anger-management therapy, case-management

services, and a "med/somatic evaluation." Mother began services but again stopped attending or responding to the provider's attempts to engage her. Mother was ultimately discharged unsuccessfully from psychological treatment services in January 2024.

{¶ 8} Mother's involvement with the criminal justice system, though, continued. After her initial release from prison, she was detained in Butler County Jail in April 2023 for violating a protection order. In September 2023, she was placed on electronic monitoring. In January 2024, Mother was again incarcerated in jail for violating a protection order. She remained in jail through the permanent custody hearing, with, at the time of the hearing, an expected release date in June 2024.

{¶ 9} In sum, Mother failed to complete significant portions of her case plan, including any of the recommended services. She never completed a domestic-violence assessment or attended anger-management classes. Mother did not engage in the recommended employment program, and, though she worked sometimes, she did not maintain stable employment. Mother was also inconsistent in maintaining contact with the Agency. The last time the Agency was able to observe Mother in her home was in February 2023.

{¶ 10} At a July 2023 review hearing, Grandmother inquired about obtaining custody of Jack, prompting a discussion of both legal custody and adoption options. The Agency indicated it would be pursuing permanent custody with an eye toward adoption by Grandmother. Subsequent Agency reports indicated that Grandmother told the Agency that she preferred adoption and was not seeking legal custody, citing concerns about potential contact with Jack's father. Throughout these proceedings, Jack's father ("Father")—eventually identified in September 2023 through genetic testing—had no contact with Jack and personally appeared only once in court to express opposition to the permanent-custody motion. No one filed a motion for legal custody as an alternative to

- 4 -

permanent custody.

{¶ 11} On September 28, 2023, the Agency moved for permanent custody of Jack. The permanent-custody hearing commenced before a magistrate on February 21, 2024, and concluded on May 8, 2024. A caseworker testified for the Agency. Mother appeared with counsel and testified. Father failed to appear. Jack's guardian ad litem ("GAL") submitted a written report that contained her recommendation that permanent custody be granted to the Agency. The GAL did not testify, and no party asked to cross-examine her about her report.

{¶ 12} On May 13, 2024, the magistrate issued a decision granting permanent custody of Jack to the Agency. The magistrate determined that Father had abandoned Jack, that Jack had been in the Agency's custody for at least 12 of the previous 22 months, and that an award of permanent custody to the Agency was in Jack's best interest. On July 23, 2024, the juvenile court overruled Mother's objections and adopted the magistrate's decision.

{¶ 13} Mother appealed.

## II. Analysis

{¶ 14} Mother's single assignment of error alleges:

> THE TRIAL COURT ERRED WHEN IT GRANTED [THE AGENCY'S] MOTION FOR PERMANENT CUSTODY AS THERE WAS AN APPROPRIATE RELATIVE PLACEMENT THAT WAS A LESS RESTRICTIVE ALTERNATIVE TO PERMANENT CUSTODY AND MOTHER COULD HAVE REUNIFIED WITH CHILD WITHIN A REASONABLE TIME.

{¶ 15} Mother's principal argument is that permanent custody should not have been granted to the Agency because Grandmother was an appropriate relative placement that offered a less restrictive alternative.

### A. Applicable Law and Standards of Review

{¶ 16} "Before a natural parent's constitutionally protected liberty interest in the care and custody of [her] child may be terminated, the state is required to prove by clear and convincing evidence that the statutory standards for permanent custody have been met." *In re M.G.*, 2023-Ohio-1316, ¶ 44 (12th Dist.); R.C. 2151.414(E). Under R.C. 2151.414(B)(1), the juvenile court may terminate parental rights and award permanent custody of a child to a children services agency if the court makes findings pursuant to a two-part test. *In re K.P.*, 2022-Ohio-1347, ¶ 17 (12th Dist.). First, R.C. 2151.414(B)(1) provides that the juvenile court must find that the grant of permanent custody to the agency is in the "best interest" of the child. *In re M.H.*, 2022-Ohio-48, ¶ 35 (12th Dist.). Second, the juvenile court must find that one of the circumstances set forth in R.C. 2151.414(B)(1)(a) to (e) applies. *In re R.B.*, 2022-Ohio-1705, ¶ 31 (12th Dist.). Those circumstances include: (1) the child is abandoned, R.C. 2151.414(B)(1)(b); (2) the child is orphaned, R.C. 2151.414(B)(1)(c); (3) the child has been in the temporary custody of one or more public children services agencies for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d); (4) the child has been removed from the parents' custody or been adjudicated as abused, neglected, or dependent on three separate occasions, R.C. 2151.414(B)(1)(e); and (5) the circumstances described in R.C. 2151.414(B)(1)(b), (c), (d), and (e) do not apply, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the parents, R.C. 2151.414(B)(1)(a). *In re J.B.*, 2023-Ohio-2454, ¶ 13 (12th Dist.). Only one of these circumstances need apply to satisfy the second prong of the two-part permanent custody test. *In re C.S.*, 2020-Ohio-4414, ¶ 16 (12th Dist.).

{¶ 17} "An appellate court's review of a juvenile court's decision granting permanent custody is generally limited to considering whether sufficient credible evidence exists to support the juvenile court's determination." *In re A.S.*, 2019-Ohio-4127, ¶ 19

- 6 -

(12th Dist.). However, "[e]ven if there is sufficient evidence to support the juvenile court's decision, an appellate court may nevertheless reverse a permanent custody judgment if it finds the judgment to be against the manifest weight of the evidence." *In re G.A.*, 2023-Ohio-643, ¶ 18 (12th Dist.), citing *In re F.S.*, 2021-Ohio-345, ¶ 61 (12th Dist.). In determining whether a juvenile court's judgment is against the manifest weight of the evidence, an appellate court "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.'" *In re S.M.*, 2019-Ohio-198, ¶ 16 (12th Dist.), quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. The presumption in weighing the evidence favors the finder of fact, which we are especially mindful of in custody cases. *In re R.K.*, 2021-Ohio-3074, ¶ 15 (12th Dist.). Therefore, if the evidence is susceptible to more than one construction, the reviewing court is bound to give it the interpretation that is consistent with the verdict and judgment. *In re D.S.*, 2022-Ohio-998, ¶ 63 (12th Dist.).

### B. First Part of the Permanent-Custody Test: Best-Interest Analysis

{¶ 18} R.C. 2151.414(D)(1) provides that in considering the best interest of a child in a permanent custody hearing, a juvenile court must consider all relevant factors, including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public

> children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . .;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

The court may also consider any other factors it deems relevant to the child's best interest. *In re A.J.*, 2019-Ohio-593 (12th Dist.).

{¶ 19} The juvenile court here determined that clear and convincing evidence showed that granting permanent custody to the Agency served Jack's best interests. The magistrate's decision, adopted by the court, shows that each of the above best-interest factors was considered in light of the evidence presented at the hearing.

{¶ 20} The first factor looks at the child's interactions and relationships. R.C. 2151.414(D)(1)(a). The magistrate found that Father had had no contact with Jack throughout the case. Mother had not visited Jack in person since his removal at birth while she was incarcerated. Jack had been placed with Grandmother in California in November 2022 and was doing well. Mother's only contact with him had been through video calls facilitated by Grandmother.

{¶ 21} The second best-interest factor asks what the child's wishes are. R.C. 2151.414(D)(1)(b). The magistrate did not conduct an in-camera interview with Jack as no party had requested it. In any event, as the GAL noted in her report, Jack was too young to express his wishes, being not yet two years old. The magistrate instead relied on the GAL's report and recommendation that permanent custody be granted to the Agency.

{¶ 22} The third best-interest factor examines the child's custodial history. R.C.

2151.414(D)(1)(c). The magistrate found that Jack had entered the Agency's temporary custody on July 5, 2022, and had been adjudicated dependent on September 15, 2022. The motion for permanent custody had been filed on September 28, 2023. As a result, Jack had been in the temporary custody of the Agency for approximately 12 months before the Agency filed the permanent-custody motion. *See* R.C. 2151.413(D)(1) and 2151.414(B)(1) (stating that a child enters temporary custody either when adjudicated under R.C. 2151.28 or 60 days after removal from the home, whichever is earlier). Jack had then remained in the Agency's temporary custody through the date of the permanent-custody hearing—approximately 22 months in total.

{¶ 23} The fourth best-interest factor considers the child's need for legally secure permanent placement. R.C. 2151.414(D)(1)(d). In analyzing this factor, the magistrate found significant concerns with both parents. The magistrate found that Mother had failed to consistently engage in required mental-health, substance-abuse, and domestic-violence services; had been diagnosed with post-traumatic stress disorder, adjustment disorder, and stimulant use disorder; had never completed the required domestic-violence assessment or anger-management therapy; had been repeatedly incarcerated throughout the case; and had not maintained stable employment. "Although Mother testified that she intends to return to mental health treatment services," wrote the magistrate, "it is clear that Mother lacks insight into her need for services, as she does not believe that she needs any mental health treatment." Father had never had contact with Jack, had appeared only once in court, had failed to meet with the Agency or to request visitation, and had not sought custody. The magistrate found no relatives had filed for legal custody as an alternative placement. Grandmother had told the Agency that she was not seeking legal custody. In sum, the magistrate found that Jack needed a legally secure permanent placement to ensure that his needs are met, and that such

placement could not be obtained without a grant of permanent custody to the Agency.

{¶ 24} The final best interest factor is whether any of the factors in R.C. 2151.414(E)(7) to (11) apply in relation to the parents and the child. The magistrate found that Father had abandoned Jack, R.C. 2151.414(E)(10), but that none of these additional factors applied as between Mother and Jack.

{¶ 25} In addition, the magistrate acknowledged the Agency's comprehensive case-planning services throughout the case, implemented to prevent the need for Jack's continued removal from Mother's care. And the magistrate found that the Agency had made reasonable efforts to prevent the need for removal. Furthermore, the magistrate deemed Jack's current placement, the case plan, and the permanency plan appropriate and in Jack's best interests. The Agency's efforts to implement the terms of the case plan and the permanency plan were also deemed reasonable. The magistrate noted the Agency's extensive efforts to identify and engage a suitable kinship caregiver for the child.

{¶ 26} The magistrate also determined that Jack could not be placed with Mother within a reasonable time or should not be placed with her. Despite the Agency's diligent efforts to assist Mother, the magistrate concluded that the concerns and conditions that had prompted Jack's removal had not been successfully resolved. Mother had persistently and repeatedly failed to make significant progress in remedying those conditions. The magistrate concluded that therefore Jack must be placed in the permanent custody of the Agency. Given the absence of any other relatives or individuals who had filed a motion requesting legal custody, there were no other reasonable alternatives. Returning Jack to Mother, determined the magistrate, would be contrary to his best interests.

{¶ 27} Mother's core argument on appeal challenges whether the evidence supports the juvenile court's conclusion that a legally secure permanent placement could

not be achieved without granting permanent custody to the Agency. She contends that placing the child with Grandmother, rather than terminating parental rights, would have provided the necessary permanency while preserving the family relationship. Mother's argument fails for several reasons.

{¶ 28} First, Mother reliance on R.C. 2151.412(H)(2) is misplaced. That provision establishes general priorities to guide agencies in developing case plans and courts in reviewing them. It provides that when parents are unable to care for their child, "the child should be placed in the legal custody of a suitable member of the child's extended family." R.C. 2151.412(H)(2). But as we and other districts have consistently held, this provision applies only to case planning—not to permanent-custody determinations. *See, e.g., In re A.K.-R.N.*, 2023-Ohio-4172, ¶ 14 (12th Dist.) ("by its plain language, this provision applies to the agency's duties in preparing a case plan, not permanent custody hearings"); *In re D.B.*, 2024-Ohio-1872, ¶ 72 (5th Dist.); *In re Tr. T.*, 2018-Ohio-2126, ¶ 17 (8th Dist.).

{¶ 29} Second, and more fundamentally, granting legal custody to Grandmother was not an available dispositional alternative because no motion for legal custody had been filed. R.C. 2151.353(A)(3) permits a court to "[a]ward legal custody of the child to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child or is identified as a proposed legal custodian in a complaint or motion filed prior to the dispositional hearing by any party to the proceedings." The motion requirement is mandatory. *In re B.L.*, 2018-Ohio-547, ¶ 25 (12th Dist.). Here, neither Grandmother nor any other party filed a motion seeking legal custody. Mother's suggestion that the Agency or the juvenile court should have forced legal custody on an unwilling Grandmother finds no support in law or logic.

{¶ 30} Mother's narrative of the Agency deliberately thwarting a potential legal-custody arrangement is belied by the record. While Grandmother did inquire about

- 11 -

custody at one hearing, she ultimately expressed a clear preference for adoption rather than legal custody. The caseworker testified that Grandmother's position reflected legitimate concerns about ongoing contact with Father under a legal-custody arrangement. Far from engaging in subterfuge, the Agency appropriately respected Grandmother's considered choice about her desired legal relationship with her grandson.

{¶ 31} Third, even if the option of granting legal custody to Grandmother had been properly before the juvenile court, its availability would not preclude a grant of permanent custody to the Agency if such disposition served the child's best interest. As the Ohio Supreme Court has explained, while courts must conduct a thorough statutory analysis weighing multiple factors to determine a child's best interest, they are not required to find that termination is the "only option" or that no suitable relative placement exists. *In re Schaefer*, 2006-Ohio-5513, ¶ 64. The statute (R.C. 2151.414) mandates consideration of all relevant factors but does not elevate any single factor—including the availability of non-termination alternatives—to dispositive status. *Id.* In other words, the availability of placement options that would preserve parental rights is one factor among many, not a controlling consideration that automatically precludes termination. Indeed, if permanent custody serves a child's best interest, legal custody to a relative necessarily does not. *In re K.B.*, 2024-Ohio-491, ¶ 85 (5th Dist.).

{¶ 32} Mother also asserts that, contrary to the magistrate's determination, she could have been reunified with Jack within a reasonable time. She notes that she expressed her willingness to participate in case-plan services during the case. Mother points out that she completed substance-abuse and mental-health assessments as required and never had a positive drug test during the life of the case. As the Agency correctly notes, Mother has failed to develop any meaningful argument regarding this reunification claim, offering only conclusory assertions without citation to authority or the

record.

**{¶ 33}** Although Mother expressed a desire to reunify with her child, she failed to make significant progress on her case plan for nearly two years. As we have previously recognized, "'[a] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security.'" *In re I.C.*, 2022-Ohio-3101, ¶ 45 (12th Dist.), quoting *In re D.E.*, 2018-Ohio-3341, ¶ 60 (12th Dist.). While we acknowledge that Mother believes she can eventually provide adequate care for Jack, we simply cannot ignore her history and that at the time of the permanent-custody hearing she was still unable to provide the stability and care Jack needed. *See In re M.J.P.L.*, 2013-Ohio-3406, ¶ 18 (12th Dist.) ("a parent's past history is often one of the best predictors of future behavior").

**{¶ 34}** The paramount inquiry in permanent custody proceedings is whether the conditions prompting removal have been meaningfully addressed, not simply whether the parent has participated in mandated services. *In re D.P.*, 2020-Ohio-6663, ¶ 19 (12th Dist.). While parents must be afforded a fair opportunity to demonstrate their capacity for reunification, this window cannot extend indefinitely at the expense of the child's need for permanency and stability. *In re K.P.*, 2022-Ohio-1347, at ¶ 43. The record here shows that Mother had not remedied the concerns that led to Jack's removal from her care, let alone substantially remedied those concerns. Mother is simply out of time.

**{¶ 35}** This is especially true given that temporary custody had reached its statutory "sunset" date under R.C. 2151.353(G), which prohibits temporary custody orders from continuing beyond two years after the initial complaint. The complaint in this case was filed on July 5, 2022, making July 5, 2024, the sunset date. When the juvenile court issued its final decision in late July 2024, no further extensions of temporary custody were legally possible. *See* R.C. 2151.415(D)(4). Jack was too young to be placed into a

planned permanent living arrangement. *See* R.C. 2151.353(A)(5) (requiring that the child be "sixteen years of age or older"). So the court faced a binary choice between permanent custody and reunification with Mother. Given Mother's circumstances and the child's need for permanency, the juvenile court's choice of the former was neither contrary to law nor against the manifest weight of the evidence.

{¶ 36} The magistrate conducted a thorough best-interest analysis, considering all statutory factors. Mother had failed to remedy the conditions that led to Jack's removal, demonstrated little insight into her mental-health and substance-abuse issues, maintained an ongoing pattern of criminal conduct and incarceration, and failed to complete case-plan services. Meanwhile, Jack had thrived in Grandmother's care since November 2022, and Grandmother had indicated she would like to adopt him. On this record, we cannot say the juvenile court erred in concluding that an award of permanent custody to the Agency would be best for the child.

### C. Second Part of the Permanent-Custody Test: "12 of 22" Analysis

{¶ 37} The R.C. 2151.414(B)(1) permanent-custody test's second part is not in dispute. Mother concedes that the Agency had temporary custody of Jack for at least 12 months of a consecutive 22-month period under R.C. 2151.414(B)(1)(d). Indeed, the record confirms this timeline conclusively. Jack entered the Agency's temporary custody on September 3, 2022—sixty days after his initial removal—as defined by R.C. 2151.414(B)(1). When the Agency filed its motion for permanent custody on September 28, 2023, Jack had been in the Agency's temporary custody for more than 12 months. *See In re L.W.*, 2024-Ohio-3228, ¶ 22 (12th Dist.) ("when determining whether a child has been in the agency's custody for 12 of the previous 22 months, the relevant time period to consider is the 22 months prior to the date the permanent custody motion was filed"). Because Mother has conceded this point, we need not review the second part of the

permanent-custody test further. *See In re J.N.L.H.*, 2022-Ohio-3865, ¶ 26 (12th Dist.). The statutory requirement was plainly satisfied.

### III. Conclusion

**{¶ 38}** The juvenile court determined that it would be in the Jack's best interest to be placed in the permanent custody of the Agency. After reviewing the evidence, we conclude that the court's determination is supported by clear and convincing evidence and is not against the manifest weight of the evidence.

**{¶ 39}** Having found no merit to Mother's arguments, we overrule Mother's sole assignment of error. The juvenile court's judgment is affirmed.

PIPER and M. POWELL, JJ., concur.