[Cite as *In re L.N.*, 2026-Ohio-1383.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| IN RE L.N., ET AL. | : | |
| | : | No. 115709 |
| Minor Children | : | |
| | : | |
| [Appeal by N.N., Mother] | : | |

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 16, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD25903978 and AD25903980

### *Appearances:*

Edward F. Borkowski, Jr., *for appellant.*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Joseph C. Young, Assistant Prosecuting Attorney, *for appellee.*

ANITA LASTER MAYS, J.:

{¶ 1} Appellant-mother N.N. ("Mother") appeals the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), that terminated her parental rights and granted permanent custody of her twin sons, A.N. and L.N., to appellee Cuyahoga County Division of Children and Family

Services ("CCDCFS" or "the agency").  Mother contends that the juvenile court's decision to grant permanent custody of the children to the agency was against the manifest weight of the evidence and that the juvenile court abused its discretion in denying Mother's motion for temporary custody to the agency or, in the alternative, for legal custody to a relative of the children.

{¶ 2} For the reasons that follow, we affirm.

## I.  Factual Background and Procedural History

{¶ 3} Mother has given birth to six children.  Her two youngest children, A.N. and L.N., born in April 2025, are the subject of this appeal.

{¶ 4} On April 22, 2025, CCDCFS filed a complaint for dependency and permanent custody of A.N. and L.N. along with a motion for predispositional temporary custody.  The complaint alleged that Mother had mental-health issues that interfered with her ability to care for the children, lacked provisions to meet the children's basic needs, and had four other children who had been previously adjudicated dependent — two of whom had been committed to the permanent custody of the Trumbull County Children Services Board ("TCCSB") and two of whom had been committed to the legal custody of separate family friends.  With respect to the children's father, the complaint claimed that the alleged father had failed to establish paternity and had failed to support, visit, or communicate with the children.

{¶ 5} Following a hearing on the motion, the juvenile court granted the agency's motion for predispositional temporary custody and committed the children

to the emergency temporary custody of CCDCFS pending further hearing. The juvenile court approved a case plan that required Mother to engage in mental-health services, maintain a sober lifestyle and comply with random drug screens, obtain and maintain employment and safe and appropriate housing, and complete a parenting program.

{¶ 6} On May 30, 2025, Mother filed a motion for temporary custody to CCDCFS or, in the alternative, for legal custody to a "maternal cousin," M.C.[1]

{¶ 7} On July 2, 2025, the juvenile court conducted an adjudicatory hearing. Mother admitted the allegations of an amended complaint and stipulated to a finding of dependency. The amended complaint alleged, in relevant part:

1. Mother has four other children who were adjudicated as Dependent. Two of the children were committed to the Permanent Custody of the Trumbull County Children Services Board due, in part, to Mother's mental health issues. See Trumbull County Juvenile Court case no. 22 CH 33. The two other children were committed to the Legal Custody of separate family friends due, in part, to Mother's inability to care for the children. See Trumbull County Juvenile Court case nos. 24 CH 9, 21 CH 36.

2. Mother has mental health issues which need to be addressed to provide safe and appropriate care for the children.

3. Mother needs the provisions to meet the children's basic needs and to care for newborns.

4. Alleged Father, John Doe, has failed to establish paternity and has failed to support, visit, or communicate with the children since birth.

---

[1] It is unclear from the record whether M.C. is, in fact, a relative of Mother or just a family friend.

{¶ 8} At the hearing, the juvenile court also admitted into evidence, without objection, certified copies of the journal entries relating to the adjudication of two of Mother's other children as dependent in June 2022 and their commitment to the permanent custody of TCCSB in August 2023. After confirming that Mother's admissions and stipulation were knowing, intelligent, and voluntary, the juvenile court adjudicated A.N. and L.N. dependent.

{¶ 9} The dispositional hearing was held on September 4, 2025. At that time, A.N. and L.N. were approximately four and-one-half months old. The evidence presented at the adjudication hearing was incorporated into the dispositional hearing.

{¶ 10} Four witnesses testified at the dispositional hearing: Becky Peters, a social worker at TCCSB; Creeshia Murry, a child protection specialist at CCDCFS; Kellie Grayon, a kinship assessor for CCDCFS; and Kemberly Adesina, a parenting coach at Beech Brook.[2] Mother also introduced copies of (1) medical records from Signature Health (dated from May 5, 2025, to August 26, 2025), where she received mental-health services, and (2) records from Beech Brook (dated from June 5, 2025, to August 14, 2025), where she participated in a parenting program. The exhibits were admitted into evidence without objection.

---

[2] M.C. did not attend the dispositional hearing. At the outset of the hearing, Mother's counsel indicated that M.C. had been hospitalized and moved for a continuance so she could attend the hearing. The juvenile court denied the motion. The juvenile court indicated that Mother could "make the arguments for legal custody" and "if or when it comes to that, we can have another separate date where we would do the Statement of Understanding."

## A. CCDCFS's Witnesses

{¶ 11} Peters, a social worker at TCCSB, testified that TCCSB first became involved with Mother after Mother gave birth to her first child in 2021 and that TCCSB continued to work with Mother until 2024. She indicated that, at that time, Mother had reported concerns with anxiety, depression, and anger and that TCCSB had concerns regarding Mother's mental-health instability, transiency, lack of verifiable income, and parenting.

{¶ 12} Peters testified that Mother "would initiate services for [her] case plan goals, initially, and then, after a period of time, would taper off and become MIA or her whereabouts would be unknown." Peters explained that Mother "starts off strong and then doesn't follow through on stuff," both as it relates to engagement with case-plan services and visitation. She indicated that after Mother had her first set of twins in 2022, Mother attended several visits "in the beginning," then stopped visiting the children. Peters stated that Mother's oldest child was then in the legal custody of a kinship placement, that her first set of twins were in the permanent custody of TCCSB, and that her fourth child was in the legal custody of another kinship placement.

{¶ 13} Murry, a child protection specialist at CCDCFS, was assigned to Mother's case in May 2025. Murry testified that a case plan was developed that required Mother to address concerns related to parenting, mental-health issues, substance-use issues, and housing. Murry indicated that paternity had not been

established for L.N. and A.N. and that the agency did not have "any identifying information" for the father and "weren't able to locate anyone."

{¶ 14} With respect to Mother's mental health, Murry testified that Mother has "a history of mental health concerns and not fully addressing those." She stated that the agency had referred Mother to Signature Health for mental-health services but that, based on the information she had received from Mother's therapist, Mother was "not consistently engaging" in mental-health services, i.e., she had missed several appointments and, in July 2025, was "on the verge of being terminated" because of missed appointments. Murry stated that, since that time, Mother attended another appointment and the therapist had been attempting to work with Mother to create a treatment plan.

{¶ 15} With respect to substance use, Murry testified that, based on Mother's history, there were concerns about Mother using and abusing marijuana and that Mother was, therefore, asked to submit to random monthly drug screens. She indicated that Mother had three negative drug screens, missed two drug screens, and had one positive drug screen for marijuana. The positive drug screen occurred in August 2025 after which Mother had another negative drug screen. After receiving notice of the positive drug screen, Murry indicated that she asked Mother about it, who claimed that she did not know why it was positive and stated that she was "on a bunch of different medications." Murry testified that she then reached out to Mother's therapist to see if treatment for substance use could be added as part of Mother's treatment plan at Signature Health. According to Murry, Mother's

therapist told Murry that Mother "is really not consistent with her, so it would be difficult to have her engage with substance." Murry testified that when she met with Mother, Mother never appeared to be under the influence of drugs or alcohol, but that she had observed marijuana on a side table during a home visit with Mother.

{¶ 16} With respect to visitation and parenting issues, Murry stated that Mother had been referred to a nurturing parenting program that consisted of group sessions and one-on-one sessions. She stated that Mother was "slightly engaged" in the program, i.e., she had missed some sessions and/or left a session early. Murry reported that Mother had two hours of supervised visitation once a week and had missed four visits — "two for no shows and two for not confirming in advance" — including, most recently, the day before the hearing. Murry indicated that initially, Mother and her live-in girlfriend would attend the visits together. Because "Mother was kind of standoffish while her girlfriend took on more of the parenting role" during those visits, Murry explained to Mother that the agency needed to observe Mother parenting the children on her own and requested that only Mother attend visits with the children. Murry stated that Mother "didn't take to it lightly" and commented that "it was her visit" and "she had a right to have whoever she wants there." Murry indicated that after that, Mother missed a visit. Murry testified that there were also concerns regarding Mother's lack of preparation for visits, i.e., failure to bring a diaper bag or "anything for the children," improper wiping when diapering, improper formula preparation, and discomfort in providing prescribed medication to the children.

{¶ 17} Murry testified that based on Mother's behavior during the visits, the agency was concerned that Mother "cannot properly provide care for the children" and that she had not shown that she had benefited from parenting classes. Murry acknowledged, however, that Mother was affectionate with the children during visits. Murry stated that it was "quite some time," i.e., over a year, since Mother had visited her other children who were in legal custody.

{¶ 18} With respect to housing, Murry indicated that Mother had obtained housing in April 2025, shortly before A.N. and L.N. were born, and had maintained housing since that time. She indicated that Mother was not employed.

{¶ 19} With respect to Mother's proposed legal custodian, M.C., Murry testified that the children had two visits with M.C. She indicated that, during these visits, M.C. fed the children but would not change their diapers and that, "other than that . . . they were typical visits."[3] Murry stated that the agency had initially approved M.C. for placement. However, after learning that M.C. had married in July 2025, the agency performed a background check on her husband. Based on "confidential" information obtained during the background check, i.e., that he had had children legally removed from his care, it was determined that he was not an appropriate caregiver. Murry testified that the agency was unable to identify any other appropriate relatives to investigate as placements.

---

[3] The juvenile court ordered that M.C. have two visits with the children between July 16, 2025, and September 4, 2025. However, the order stated that "[t]he focus of the visits shall remain on the relationship between the mother and the children." Murry acknowledged that M.C. may have been stepping back during visits to allow Mother to exhibit her parenting skills.

{¶ 20} Murry testified that the children were currently placed with foster parents in the same home as their older twin siblings and that, based on the interaction she observed, L.N. and A.N. were "definitely well bonded" both with their caregivers, who provided necessary structure for the children, and their older siblings. Murry stated that she did not anticipate any placement changes if the agency was granted permanent custody of the children.

{¶ 21} With respect to the agency's request for permanent custody, Murry stated that the agency believed that permanent custody was in the children's best interest because Mother "has not consistently addressed the Agency concerns to alleviate the . . . concerns" and "[t]he children are placed with older siblings where they can grow up and thrive." Murry explained that, in her view, Mother had "not fully benefitted" from services and not remedied the concerns that led to the removal of the children from her care because "[a]lthough Mother is linked with services, she is not consistently engaging" and has not shown "a behavioral change" such that "she can parent the children" and "provide a safe and stable permanent home" for them. Murry further noted that "this has been a consistent thing with mother," i.e., "[t]his isn't the first time that she's been asked to complete services or engage in services."

{¶ 22} Grayson, a kinship assessor for CCDCFS, testified that she completed the kinship assessment for M.C., Mother's proposed legal custodian, which included a questionnaire, an interview, fingerprinting, a background check, and a home inspection. She described M.C. as a friend of Mother, "not necessarily a blood

relative, but like a fictive kin type situation." She stated that when interviewing M.C., who lives in Warren, they discussed transportation of the children for visitation with Mother and that M.C. indicated she would drive the children back and forth. Grayson stated that she later learned that M.C.'s driver's license had been suspended until 2027.

## B. Mother's Witness

{¶ 23} Adesina, a parenting coach at Beech Brook, testified that she completed Mother's intake for parenting services in June 2025 and that Mother had been assigned a one-on-one parenting coach and had attended online group parenting classes that were held twice a month.

{¶ 24} Adesina testified that Mother missed two group classes that she had to make up — one because she was recovering from hand surgery and the other because of an issue with Mother's internet. She stated that, as of the date of the hearing, Mother had completed three of four required group parenting classes.

{¶ 25} Adesina testified that Mother was "usually the first person online" and that she actively participated in the group parenting classes, asking and answering questions and reflecting on the lessons learned. Adesina did not have any information regarding Mother's involvement with her one-on-one parenting coach.

## C. Signature Health and Beech Brook Records

{¶ 26} The Beech Brook records Mother introduced into evidence reflect that Mother attended online group classes on June 26, 2025, July 10, 2025, and

August 14, 2025, and that she attended an initial one-on-one coaching session on August 1, 2025.

{¶ 27} The Signature Health records indicate that Mother reported "anger" as her primary emotional difficulty along with fluctuating anxiety and depressive symptoms and that Mother had been diagnosed with various mental-health issues. The records reflect that Mother attended an assessment on May 5, 2025, and went to counseling sessions in June and August 2025, but do not show her making significant progress in addressing her mental-health issues. An entry dated June 26, 2025, indicates that Mother "demonstrated minimal improvement in session today" and that "[o]verall impression of treatment demonstrates no change as evidenced by initial appt." An entry dated two months later, on August 26, 2025 — a few days before the hearing — indicates that Appellant "demonstrated no change in session today as evidenced by not being able to identify goals for counseling services" and that "[o]verall impression of treatment demonstrates minimal improvement as evidenced by self reports of progressing on case plan from CPS." The records also reflect that Mother, at times, failed to make or missed appointments. According to an entry dated August 26, 2025, Mother told the therapist, "I've been really busy and haven't had time to make my appts," and an entry dated August 11, 2025, indicates that Mother "missed therapy appointments due to stress."

### D. Guardian Ad Litem's Recommendation

{¶ 28} On July 1, 2025, the children's guardian ad litem submitted a written report in which she recommended that permanent custody be granted to CCDCFS. In support of her recommendation, the guardian ad litem noted that the children had been in agency custody since April 22, 2025 (having been removed from Mother's care and custody shortly after birth), that four other children had been removed from Mother's care and custody on three separate occasions, and that none of Mother's other children had ever been returned to her care and custody. The guardian ad litem reported that Mother "has attended some visitation" with the children but "continues to have unresolved mental health and substance abuse issues" and that she had failed consistently engage in services to address her mental-health issues and provide consistent drug screens to demonstrate her sobriety "to ensure that she is able to provide appropriate and safe care" for the children.

{¶ 29} At the conclusion of the dispositional hearing, the guardian ad litem indicated that she stood by her recommendation of permanent custody. In response to questioning by Mother's counsel, the guardian ad litem reported that she had observed Mother interacting with the children once during a visit, for approximately an hour, but that she had never spoken with Mother and had never seen Mother's home. The guardian ad litem stated that she was unable to speak with Mother's service providers because she did not have signed releases authorizing her to do so but that she had reviewed records that had been provided.

{¶ 30} The guardian ad litem stated that she had visited the children twice, including in their current foster placement. She indicated that she had spoken with M.C. once at court and had attempted to schedule a home visit with her but was unsuccessful. The guardian ad litem stated that she had not had an opportunity to observe M.C. interacting with the children but that she had spoken with the CCDCFS case worker and that the case worker did not raise any concerns regarding M.C.'s visits with the children.

### E. Mother's Requested Disposition

{¶ 31} In her closing argument, Mother's counsel acknowledged that Mother had not completed her case-plan services and did not request that the children be returned to her care and custody at that time. Mother's primary request was that the court grant temporary custody to the agency to give her "a chance to further demonstrate to the Agency and to the Court that she is serious about this" and "to at least allow [M]other to continue to complete her case plan." In the alternative, Mother requested that legal custody of the children be granted to M.C., whom Mother argued had been approved by the agency for placement and was "a strong, stable, connected person to the biological mother that would be an adequate and appropriate placement for the children."

### F. The Juvenile Court's Decision

{¶ 32} On September 15, 2025, the juvenile court issued a judgment entry denying Mother's motion for legal custody to M.C., granting permanent custody of A.N. and L.N. to the agency, and terminating Mother's (and John Doe father's)

parental rights. The juvenile court found that the children "cannot and should not be placed with either parent" in accordance with R.C. 2151.414(E) and that all of the relevant best-interest factors under R.C. 2151.414(D)(1) weighed in favor of permanent custody. The juvenile court further found that the agency had made reasonable efforts to prevent placement and/or to make it possible for the children to remain in or return to the home.

{¶ 33} Mother appealed, raising the following three assignments of error for review:

> I. The trial court abused its discretion by granting permanent custody of appellant's children to CCDCFS against the manifest weight of the evidence.

> II. The trial court abused its discretion by denying mother's motion for legal custody to a relative.

> III. The trial court abused its discretion by denying mother's [sic] for temporary custody to the agency.

## II. Law and Analysis

{¶ 34} The right to raise one's own child is "'an essential and basic civil right.'" *In re N.B.*, 2015-Ohio-314, ¶ 67 (8th Dist.), quoting *In re Hayes*, 79 Ohio St.3d 46, 48 (1997); *see also In re Murray*, 52 Ohio St.3d 155, 157 (1990) (a parent has a "'fundamental liberty interest' in the care, custody, and management" of his or her child), quoting *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). However, this right is "'always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re L.D.*, 2017-Ohio-1037, ¶ 29 (8th Dist.), quoting *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979).

{¶ 35} "'All children have the right, if possible, to parenting from either natural or adoptive parents which provides support, care, discipline, protection and motivation.'" *In re J.B.*, 2013-Ohio-1704, ¶ 66 (8th Dist.), quoting *In re Hitchcock*, 120 Ohio App.3d 88, 102 (8th Dist. 1996). Where parental rights are terminated, the goal is to create "a more stable life for the dependent children" and to "facilitate adoption to foster permanency for children." *In re N.B.* at ¶ 67.

### A. Standard for Terminating Parental Rights and Granting Permanent Custody to CCDCFS

{¶ 36} An agency may obtain permanent custody of a child in one of two ways. *In re L.G.*, 2022-Ohio-529, ¶ 51 (8th Dist.); *In re J.F.*, 2018-Ohio-96, ¶ 44 (8th Dist.). An agency may (1) first obtain temporary custody of the child and then file a motion for permanent custody under R.C. 2151.413 or (2) a complaint may include an original dispositional request for permanent custody under R.C. 2151.353(A)(4). *In re L.G.* at ¶ 51; *In re J.F.* at ¶ 44. In this case, the agency requested a disposition of permanent custody for A.N. and L.N. as part of its complaint. Therefore, R.C. 2151.353 applies.

{¶ 37} Pursuant to R.C. 2151.353(A)(4), if a child has been adjudicated abused, neglected, or dependent, the juvenile court may commit the child to the permanent custody of CCDCFS if the juvenile court determines that (1) the child "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent" in accordance with R.C. 2151.414(E) and (2) "the

permanent commitment is in the best interest of the child" in accordance with R.C. 2151.414(D)(1). *In re L.G.* at ¶ 52; *In re J.F.* at ¶ 48.[4]

{¶ 38} The standard of proof applied to permanent-custody determinations is clear and convincing evidence. Clear and convincing evidence is that "'measure or degree of proof'" that "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

{¶ 39} A juvenile court's decision to grant permanent custody of a child to CCDCFS and terminate parental rights is reviewed under sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review depending on the nature of the arguments presented by the parties. *In re Z.C.* at ¶ 11; *In re T.W.*, 2026-Ohio-124, ¶ 44 (8th Dist.). Here, Mother challenges the juvenile court's permanent-custody determination as being against the manifest weight of the evidence.

---

4 In her appellate brief, Mother cites to R.C. 2151.414(B) as establishing other requirements for granting permanent custody to the agency. R.C. 2151.414(B) applies when a motion for permanent custody is filed. Because CCDCFS requested permanent custody as part of its complaint, that provision does not apply here. *See In re T.W.*, 2026-Ohio-124, ¶ 48, fn. 4 (8th Dist.).

**B. Manifest Weight of the Evidence**

{¶ 40} In her first assignment of error, Mother contends the juvenile court's judgment should be reversed because its findings that A.N. and L.N. "cannot and should not be placed" with Mother and that permanent custody was in the children's best interest are against the manifest weight of the evidence.

{¶ 41} When reviewing a juvenile court's decision regarding permanent custody for manifest weight of the evidence,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.

*In re Z.C.* at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20.

### 1. Determination that Children "Cannot and Should Not Be Placed" with Mother

{¶ 42} When determining whether a child "cannot be placed with one of the child's parents within a reasonable time or should not be placed with either of the parents" under R.C. 2151.353(A)(4) and 2151.414(E), a juvenile court must consider "all relevant evidence." R.C. 2151.414(E). If the court finds, by clear and convincing evidence, that at least one of the factors specified in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court "shall" find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. *Id.* Here, the juvenile court found that the children's father had not

been identified and that the factors specified in R.C. 2151.414(E)(1) and (11) applied as to Mother:

> Pursuant to R.C. 2151.353(A)(4), the Court finds that the child cannot and should not be placed with either parent for the following reasons in accordance with Division (E) of Section 2151.414:
>
> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be removed from the parents, the parents have failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the home.
>
> (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child. See, CCDCFS Exhibits 1 and 2 from the adjudication.

{¶ 43} Mother challenges the juvenile court's finding under R.C. 2151.414(E)(1) on the grounds that (1) the evidence showed she was engaged in mental-health services "though perhaps not completely consistently," (2) Adesina testified that Mother "was taking the case plan seriously," and (3) the agency did not present any evidence that Mother was unable to support herself and the children.

{¶ 44} Mother challenges the juvenile court's finding under R.C. 2151.414(E)(11) on the grounds that (1) "the only evidence" presented to establish that Mother's parental rights to two of her older children had been terminated was the testimony of Peters that "[t]he twins were placed in permanent custody of the Agency," which she contends was "not enough to have created in the mind of the

juvenile court 'a firm belief or conviction as to the facts sought to be established,'" and (2) "there was clear and convincing evidence that [Mother] was able to provide a secure placement for the Children and provide for their basic needs" based on evidence that Mother had housing, had engaged in mental-health services, had submitted to all but two requested drug screens, was actively involved in parenting services, and was visiting with the children.

{¶ 45} We first address the juvenile court's finding under R.C. 2151.414(E)(11). At the adjudicatory hearing, Mother admitted that two of her children had been committed to the permanent custody of TCCSB due, in part, to Mother's mental-health issues. A certified copy of the journal entry that committed those children to the permanent custody of TCCSB was admitted into evidence at the adjudicatory hearing. The evidence presented at the adjudicatory hearing was incorporated into the dispositional hearing. Thus, the record clearly establishes that Mother had her "parental rights involuntarily terminated with respect to a sibling" of A.N. and L.N. under R.C. 2151.414(E)(11) and Mother had the burden to prove by clear and convincing evidence that, notwithstanding the prior termination, she could "provide a legally secure permanent placement and adequate care for the health, welfare, and safety" of A.N. and L.N. *See, e.g., In re M.A.*, 2025-Ohio-4473, ¶ 27 (8th Dist.); *In re J.H.*, 2017-Ohio-940, ¶ 22 (8th Dist.); *see also In re A.W.*, 2022-Ohio-3715, ¶ 23 (1st Dist.) ("R.C. 2151.414(E)(11) allows a parent to rebut the presumption — created by the previous involuntary termination — that he or she is an unfit parent."); *In re M.J.*, 2024-Ohio-1261, ¶ 17 (9th Dist.) (interpreting R.C.

2151.414(E)(11) as requiring a parent "to present clear and convincing evidence of his or her current ability, at the time of the hearing, to provide an appropriate home for the child"); *In re K.R.*, 2023-Ohio-936, ¶ 39 (8th Dist.) ("R.C. 2151.414(E)(11) allows a parent to establish that despite the prior ruling, they can now provide a legally secure placement and adequate care for the health, welfare, and safety of the child.").

{¶ 46} The record supports the juvenile court's determination that Mother failed to meet this burden.

{¶ 47} Mother's counsel acknowledged during her closing argument that Mother was not then in a position to have the children returned to her care and custody. As detailed above, although the record reflects that Mother had obtained housing, had participated in group parenting classes, and was seeking treatment for her mental-health issues, she was unemployed, she had not completed a mental-health treatment plan, and was not consistently engaging in mental-health services. Further, she was not shown to have benefited from mental-health services, she had not completed or shown to have benefited from parenting classes, and there were unresolved concerns regarding Mother's use of marijuana.

{¶ 48} "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re Z.F.*, 2024-Ohio-1698, ¶ 45 (1st Dist.), quoting *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). While Mother may have affection for the children and desire to be a

supportive parent, she had not met her case-plan objectives and did not present clear and convincing evidence that she was able to provide a legally secure placement and provide for the health, welfare, and safety of L.N. and A.N.

{¶ 49} The juvenile court's finding under R.C. 2151.414(E)(11) was not against the manifest weight of the evidence.  Because a court need only find that one of the R.C. 2151.414(E) factors applies to compel a finding that a child cannot or should not be placed with a parent, we need not analyze the juvenile court's finding under R.C. 2151.414(E)(1) pertaining to Mother.  R.C. 2151.414(E); *In re A.E.*, 2025-Ohio-1466, ¶ 14 (8th Dist.); *In re L.V.*, 2024-Ohio-5917, ¶ 53 (8th Dist.).

## 2.  Best-Interest Determination

{¶ 50} To grant permanent custody of the children to the agency, the juvenile court was also required to find by clear and convincing evidence that "permanent commitment is in the best interest of the child" in accordance with R.C. 2151.414(D)(1).  R.C. 2151.353(A)(4).  R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

Because the juvenile court found that R.C. 2151.414(E)(11) applied, it was required to again consider that factor in its best-interest analysis. R.C. 2151.414(D)(1)(e); *In re C.B.*, 2025-Ohio-5614, ¶ 26 (9th Dist.).

{¶ 51} The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, at ¶ 59 (8th Dist.). Indeed, R.C. 2151.414(C) expressly prohibits the juvenile court from considering the effect the granting of permanent custody to the agency would have upon the parents in making its determination. *In re J.C.-A.*, 2020-Ohio-5336, ¶ 80 (8th Dist.). Although the juvenile court is required to consider each relevant factor in determining what is in a child's best interest under R.C. 2151.414(D)(1), no one factor is required to be given greater weight than the others. *In re A.L.*, 2024-Ohio-1992, ¶ 31 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Further, only one of the factors need be resolved in favor of permanent custody to terminate parental rights. *In re R.M.*, 2024-Ohio-1885, ¶ 60 (8th Dist.); *In re J.C.-A.* at ¶ 80; *In re N.B.* at ¶ 53.

{¶ 52} The record reflects that the juvenile court considered each of the relevant R.C. 2151.414(D)(1) factors, the evidence presented at the adjudicatory and dispositional hearings, and the recommendation of the guardian ad litem in determining that granting permanent custody to the agency was in the children's best interest. In its September 15, 2025 journal entry, the juvenile court identified

the specific factors it considered, including all of the factors specified in R.C. 2151.414(D)(1), and found that all of these factors "weigh in favor of permanent custody." The juvenile court explained:

> As discussed below, the Court finds all these factors weigh in favor of permanent custody. While the child is too young to express wishes, the child's GAL recommends permanent custody.
>
> The mother has four other children, none of whom are in her custody. Two of them were placed in the permanent custody of the Trumbull County child protection agency. Two others were placed in the legal custody of others. The mother was involved with the Trumbull County agency from 2021 until 2024. She would start off well on case plan services and visits but did not follow through with either.
>
> As two of older siblings of these twins were placed in the permanent custody of a children services agency, the burden shifts to the mother to prove "by clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child." R.C. 2151.414(E)(11). She has not met this burden.
>
> The mother has not addressed the issues that led to the removal of this child or the removal of her older children. A case plan was created for this case which the mother agreed to and signed. The case plan identified substance abuse/use, mental health, parenting, and housing. The mother has started parenting classes but has not finished them.
>
> The records submitted from Signature Health as Defendant's Exhibit A do not show that the mother is benefiting from mental health services, nor do they show that she will benefit from further services if temporary custody is granted. See, page 2 of Exh. A in the Response/Impression paragraph.
>
> Regarding the issue of substance use, there was testimony that marijuana was found in the mother's home, that she tested positive for the presence of marijuana at the beginning of August, and that she has missed two other screens. In the overall context of losing custody of four other children and in the pattern of inconsistent case plan service cooperation and visitation, the issue of marijuana consumption has a different meaning than it would in other contexts.

The mother has missed four visits. There was credible testimony that the mother was not an effective parent with examples provided in the testimony.

The mother does not have employment.

She has not visited the two siblings of these children who were placed in the legal custody of relatives "in quite some time" which was testified to be at least over a year in time.

There is no named father for the child, and no one has come forward to establish paternity.

{¶ 53} These findings and the juvenile court's determination that permanent custody was in the children's best interest are supported by the record.

{¶ 54} The record reveals that the children were removed at birth, due in part, to Mother's unresolved mental-health issues, which Mother admitted, in her stipulation to the amended complaint, "need[ed] to be addressed" in order to "provide safe and appropriate care" for A.N. and L.N. The record further reveals that Mother had lost custody of four other children, due in part to her mental-health issues and/or inability to care for them. Prior to her involvement with CCDCFS, Mother had been involved with TCCSB from 2021-2024, where she was referred for services to address, among other things, her mental-health and parenting issues. When A.N. and L.N. were born, Mother was again referred for services, this time through CCDCFS.

{¶ 55} A.N. and L.N. had not been in their Mother's care and custody since birth. Murry testified regarding Mother's failure to consistently engage in mental-health services, and the records Mother introduced from Signature Health do not show that Mother was making any significant progress in stabilizing her mental

health.  Murry further testified regarding missed Mother's visits with the children, Mother's failure to visit her other children who were in legal custody, and the deficiencies she observed with Mother's parenting during supervised visits.  Murry also testified that there were unresolved concerns regarding Mother's substance use because of missed drug screens, a recent positive drug screen, and her observation of marijuana in Mother's home.  Based on Mother's history, her unresolved mental-health issues, her failure to consistently engage in services to address those issues, and her failure to provide consistent drug screens to demonstrate her sobriety, the guardian ad litem recommended that permanent custody be granted to the agency.

{¶ 56} The record shows the juvenile court engaged in a proper analysis and made the requisite statutory determinations pursuant to R.C. 2151.353(A)(4) — in accordance with R.C. 2151.414(E) and 2151.414(D)(1) — in granting permanent custody to the agency.  These determinations were supported by clear and convincing evidence.  Following a thorough review of the record, having weighed the evidence and all reasonable inferences and having considered the credibility of the witnesses, we cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered.  *In re Z.C.*, 2023-Ohio-4703, at ¶ 14.  Accordingly, we overrule Mother's first assignment of error.

### C. Mother's Motion for Temporary Custody or Legal Custody to M.C.

{¶ 57} In her second and third assignments of error, Mother challenges the juvenile court's denial of her motion to place the children in the legal custody of M.C. or to grant the agency temporary custody of the children as alternative dispositions to permanent custody under R.C. 2151.353(A)(2)-(3). In her second assignment of error, Mother argues that the juvenile court abused its discretion in denying her motion for legal custody to M.C. because M.C. was approved by the agency and the best-interest factors "weigh in favor of legal custody being in the Children's best interest." In her third assignment of error, Mother argues that, "[g]iven the progress" she had made in obtaining housing and engaging in services, the juvenile court should have given Mother "additional time to continue to make progress" by granting the agency temporary custody, rather than permanent custody, of A.N. and L.N.

{¶ 58} Here, the record reveals that although the agency initially identified M.C. as an appropriate placement who could potentially serve as legal custodian for the children, by the time of the hearing, circumstances had changed. In denying Mother's motion for legal custody, the juvenile court pointed out that M.C. had recently gotten married, her spouse had been investigated, and "neither the agency nor the children's guardian ad litem supported the granting of legal custody to proposed legal custodian." The juvenile court further noted that there were "[o]ther concerns with this legal custody motion [that] were raised during the trial," e.g., that

M.C.'s husband had previously had children legally removed from his care and the suspension of M.C.'s driver's license until 2027.

{¶ 59} The issue before the juvenile court was not whether M.C. was — or could be — an appropriate caregiver for the children. The issue before the juvenile court was what was in the best interest of the children. *See, e.g., In re C.T.*, 2021-Ohio-2274, ¶ 78 (8th Dist.). "'[T]he willingness of a relative to care for a child does not alter what the court must consider in determining permanent custody.'" *In re B.K.*, 2023-Ohio-1820, ¶ 31 (8th Dist.), quoting *In re M.S.*, 2015-Ohio-1028, ¶ 11 (8th Dist.). The juvenile court "'is not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.'" *In re B.K.* at ¶ 31, quoting *In re M.S.* at ¶ 11; *see also In re C.T.* at ¶ 78-79. If granting permanent custody to the agency is determined to be in a child's best interest, granting legal custody to a relative — or temporary custody to the agency — "necessarily is not." *In re Z.D.*, 2025-Ohio-969, ¶ 20 (8th Dist.); *In re D.E.*, 2025-Ohio-654, ¶ 15 (8th Dist.).

{¶ 60} With respect to Mother's request for temporary custody to the agency, although the record reflects that Mother had obtained housing and had been engaging in some aspects of her case-plan services, there was no evidence Mother had made significant progress on her case-plan objectives relating to parenting, maintaining a sober lifestyle, or stabilizing her mental health. At the time of the hearing, Mother was not in a position to provide stable, safe, and appropriate care for the children, and there was nothing in the record to indicate that she would be

able to do so at any reasonable time in the future. *See, e.g., In re D.H.*, 2022-Ohio-2780, ¶ 43 (8th Dist.) ("[E]ven substantial compliance" with case-plan services "'does not of itself preclude a grant of permanent custody to a children services agency' and 'does not mean that the parent has achieved the ultimate goals of the plan or that the parent has substantially remedied the conditions that caused the children to be removed.'"), quoting *In re A.P.*, 2016-Ohio-5848, ¶ 19 (8th Dist.).

{¶ 61} Ohio law authorizes an agency to request an original disposition of permanent custody on a complaint. *See* R.C. 2151.353(A)(4). There is no requirement that a child must first be placed in temporary custody or that Mother must be afforded additional time to complete plan services before permanent custody may be ordered. *See, e.g., In re D.E.*, 2025-Ohio-654, at ¶ 15 (8th Dist.); *In re Ky.D.*, 2024-Ohio-3198, ¶ 52 (8th Dist.); *In re West*, 2005-Ohio-2978, ¶ 51 (4th Dist.).

{¶ 62} Accordingly, we overrule Mother's second and third assignments of error.

{¶ 63} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
ANITA LASTER MAYS, JUDGE

MICHAEL JOHN RYAN, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR