[Cite as *In re D.D.*, 2026-Ohio-1973.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

|  |  |  |
|---|---|---|
| IN RE D.D., ET AL. | : | |
| | : | Nos. 115605 and 115622 |
| Minor Children | : | |
| | : | |
| [Appeals by T.C., Mother, and T.H., | : | |
| Grandmother/Former Legal Custodian] | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** DISMISSED IN PART; AFFIRMED
**RELEASED AND JOURNALIZED:** May 28, 2026

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case Nos. AD23903469, AD23903470, AD23903471,
AD23903472, and AD23903473

### *Appearances:*

Wargo Law, LLC and Leslie Wargo, *for appellant* T.C.

Rosel C. Hurley, III, *for appellant* T.H.

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Joseph C. Young, Assistant Prosecuting
Attorney, *for appellee* CCDCFS.

EILEEN T. GALLAGHER, J.:

{¶ 1} In this consolidated appeal, appellant-mother T.C. ("Mother") and

appellant-maternal grandmother and former legal custodian T.H. ("Grandmother")

appeal from the judgment of the Cuyahoga County Court of Common Pleas, Juvenile Division (the "juvenile court"), that terminated Mother's parental rights, terminated Grandmother's legal custody rights, and granted permanent custody of five of Mother's children to appellee Cuyahoga County Division of Children and Family Services ("CCDCFS" or "the agency").

{¶ 2} For the reasons that follow, we dismiss Grandmother's appeal (Appeal No. 115622) for lack of standing and affirm the juvenile court.

## I. Factual Background and Procedural History

{¶ 3} This case involves five children, D.D. (date of birth August 14, 2010), Sa.D. (date of birth September 23, 2011), St.D. (date of birth September 22, 2012), J.D. (date of birth October 23, 2019), and K.D. (date of birth January 8, 2021). S.D. ("Father") is the father of the five children.[1] The three oldest children, D.D., Sa.D., and St.D., were removed from Mother's care in 2013 and were placed in the legal custody of Grandmother in 2015. In 2018, Mother and Father had their parental rights terminated with respect to two other children, who were placed in the permanent custody of CCDCFS. In or around January 2023, CCDCFS again became involved with the family, following a physical altercation between Mother and D.D. Because Grandmother had difficulty obtaining housing for herself and the older children, she and the older children had moved in with Mother and Father (and the

---

[1] Because Father stipulated to the granting of permanent custody to the agency and has not appealed the juvenile's court's judgment, we limit our discussion of the facts, evidence, and findings to those that pertain primarily to Mother and Grandmother.

two youngest children).[2]  After Grandmother and the children moved into the parents' home, there was significant conflict between Mother and the older children. At that time, there were also concerns of educational neglect (i.e., the three oldest children had not been consistently attending school), behavioral issues involving the two oldest children (e.g., talking back and not listening that resulted in physical confrontations) that the parents and Grandmother had difficulty managing, inappropriate discipline of the older children by Mother (e.g., allegedly slapping D.D. in the face and throwing a tote and broom at her), poor housing conditions (e.g., bed bugs, roaches, trash, and clutter) that precluded the family from receiving in-home counseling services, and housing instability for Grandmother.  In January 2023, Sa.D. had been hospitalized for a week for suicidal ideations.  At that time, the three oldest children had been referred for individual counseling and the family had been referred for family counseling.

{¶ 4} On March 20, 2023, CCDCFS filed a complaint alleging that the children were neglected (D.D., Sa.D., and St.D.) or dependent (J.D. and K.D.) and requesting an order of temporary custody, along with a motion for predispositional temporary custody.  With respect to the three oldest children, the complaint alleged that (1) Grandmother had failed to ensure that the children were regularly attending school and, as a result, the children were failing classes and missing in-school

---

[2] Before Grandmother moved in with Mother and Father, some or all of the children in Grandmother's custody were, at times, living with Grandmother or were split up, living with different family members.

counseling sessions; (2) Grandmother struggled to maintain stable, appropriate housing for the children; (3) the children had "behavioral issues" that the adults did not appropriately address; (4) the adults failed to ensure that the children participated in counseling services to address their behaviors; (5) Mother "regularly engage[d] in verbal altercations" with the older children; and (6) Grandmother had "failed to prevent the continued occurrence of conflict in the home."[3] With respect to the two youngest children, the complaint alleged that they had "been exposed to violence in the home" related to the adults' "inability to appropriately interact" with the older children or "appropriately address their behaviors." The complaint also referenced the prior adjudication of D.D., Sa.D., and St.D. as dependent and the prior termination of Mother's parental rights with respect to two other children. Following a hearing held on July 12, 2023, the children were placed in agency custody. The children remained in the uninterrupted custody of the agency since that time.

---

[3] At the adjudication and disposition hearings held in July 2023, CCDCFS case worker Chaquelya Patterson testified that, at the time the agency filed its complaint in March 2023, D.D. had missed 58 days of school, Sa.D. had missed 77 days of school, and St.D. had missed 68 days of school. She indicated that the reasons for the lack of school attendance included "[o]ngoing transportation issues. There are times when they didn't have money to get the kids to school, or there's been also times where one of the kids wouldn't go to school, and then they weren't able to take all of them to go back and forth. There's also times when they've been sick." She stated that the school had "provided support to the family" by "offer[ing] them gas cards to school" and that she had spoken with the family about possibly transferring the children to a school that was closer to their residence to make it easier to get the children back and forth to school. She stated that Sa.D. was transferred to an online school program when she did not want to go to school but that she still would attend the online program only two or three days per week. Patterson testified that there was no claim that Grandmother had engaged in physical altercations with, or inappropriate discipline of, any of the children.

{¶ 5} On August 3, 2023, the juvenile court adjudicated D.D., Sa.D., and St.D. neglected and J.D. and K.D. dependent and committed the children to the temporary custody of the agency. The juvenile court approved a case plan that required the parents and Grandmother to complete an approved parenting program, for the family to engage in family counseling to address the conflict in the home with the older children, for Grandmother to ensure that the older children were prepared for and attended school every day, and for Grandmother to establish and maintain safe, stable, and appropriate housing for herself and the older children. Case-plan services for the three oldest children included individual and family counseling. The permanency plan was reunification of the three oldest children with Grandmother and reunification of the two youngest children with Mother.

{¶ 6} Following a hearing before the magistrate (and with the agreement of Mother and Grandmother), temporary custody was extended in April 2024. The juvenile court found that Mother and Grandmother had made some progress on the case plan but that sufficient progress had not yet been made to alleviate the cause for the removal of the children from the home.

{¶ 7} Sometime in or around June 2024, Mother separated from Father and moved out of Father's home. Accordingly, the case plan was amended to require Mother to obtain stable, safe, and appropriate housing. After separating from Father, Mother moved in with Grandmother.

{¶ 8} In August 2024, the magistrate held a hearing to discuss, among other things, the agency's proposed reduction in visitation to biweekly visits. The agency case worker, Chaquelya Patterson, indicated that the agency was requesting the reduction because it did not believe the children were benefiting from the visits. She explained:

> [D]uring the visits, the three oldest children . . . they use explicit words. They become very disrespectful to the parents and to the worker as well. And the parents, they do not respond in a way where they are redirecting the children.
>
> We have not seen what they were learning in their parenting classes apply to the visits. . . .
>
> Anytime I try to redirect the children or even just inform the mother or the grandmother what's going on, I get ignored. And we had several meetings about this. And we had a meeting about this to talk to the family about it. . . .
>
> So we had meetings about the visits and the appropriateness of the visits and nothing still has changed from the family.

She also noted that, despite her discussions with Mother and Grandmother about these issues, Mother and Grandmother continued to have inappropriate "adult conversations" with the children during visits that "don't need to be had there" and that Grandmother had talked to the children "about things that become very emotional to the children."

{¶ 9} The juvenile court rejected the agency's proposed reduction of visitation, reasoning that it would not be in the children's best interest given that they were seeing some benefit from the family counseling. However, the magistrate warned Mother and Grandmother that they risked the children being placed in

permanent custody if they did not promptly make significant progress in resolving the issues with their parenting:

> I'm very concerned regarding the reports that I've received here today by the Agency and by the Guardian ad Litem regarding the lack of progress regarding parenting skills by the grandmother, mother . . . . [W]e're a year and a half into this case, any issues regarding parenting skills should have been resolved long before right now. And it sounds like the Agency has services in place. There's family counseling and there's a glimmer of hope with that family counseling that is actually showing some benefit. . . .
>
> [Mother, Grandmother, and Father] you are the adults in this situation. You are the parents and grandparents of these children, the legal custodian of the three older children. It's your responsibility and (inaudible) the Court's expectation of you to appropriately parent these children.
>
> And if you don't know what that means, then you need to work with Ms. Patterson, work with a parenting coach, work with family counselor. Because if we are a year and a half into this case, and Ms. Patterson and other professionals are still bringing these issues to your attention and they're not being resolved, [t]hen the Court is going to start asking why they can't be resolved and are they even capable of — are you capable of resolving that. We're coming up on the year and a half mark and the Agency is gonna need to file a motion, that's either gonna be a motion to return these children to you, from what I'm hearing right now, it doesn't sound like we're there.
>
> It's going to be a motion to extend or it's gonna be a motion to modify to permanent custody. So your behavior is going to help direct that decision. You start showing some improvements, then I would expect we're looking at an extension. And if it stays the same or gets worse, I would expect the closer we get to that two year mark, we're gonna be looking at a motion for permanent custody.

{¶ 10} On September 19, 2024, CCDCFS filed a motion to modify temporary custody to permanent custody. The agency argued that the children should be committed to the permanent custody of the agency because they had been in agency custody since July 2023, Mother's parental rights had been previously terminated

with respect to two other children, and Mother and Grandmother had "failed to benefit from case plan services" and lacked stable, safe, and appropriate housing. On December 19, 2024, Mother filed a "motion for legal custody to [M]other or relative," requesting that she be granted legal custody of the children or, alternatively, that an unidentified "relative" be granted legal custody of the children. Mother indicated that the motion would be supplemented with a statement of understanding for legal custody, but no such statement was filed with respect to the "relative."

### A. The Permanent-Custody Hearing

{¶ 11} On August 12, 2025, the juvenile court held an evidentiary hearing on the agency's motion for permanent custody and Mother's motion for legal custody. At the time of the hearing, D.D. was 14 (nearly 15), Sa.D. was 13, St.D. was 12, J.D. was 5, and K.D. was 4.

{¶ 12} The agency presented testimony from Patterson and Kayla Morales, extended case workers for CCDCFS. Mother presented testimony from Mary Beth Hooper, Mother's therapist at OhioGuidestone. CCDCFS also introduced various exhibits, consisting primarily of copies of journal entries and case plans from these cases and others, which were admitted into evidence over Mother's objection.[4] A summary of the relevant evidence follows.

---

[4] Although Mother's counsel objected generally to the admission of CCDCFS's exhibits "for various reasons," including because "[w]e don't think a lot of them are relevant," he did not raise any specific objection or articulate any specific reason why any particular exhibit should not be admitted.

## 1. Testimony by CCDCFS Case Workers

{¶ 13} Patterson was the CCDCFS case worker assigned to the family from May 2023 to November 2024; Morales was the CCDCFS case worker assigned to the family beginning in November 2024. They testified regarding the family's history with CCDCFS, the children's custodial history in these cases, Mother and Grandmother's compliance with case-plan services, and the extent to which Mother and Grandmother met case-plan objectives.

{¶ 14} Patterson testified that, when the agency became involved with the family in January 2023, following a physical altercation between Mother and D.D., a safety plan was put in place pursuant to which Father and Grandmother were to make sure that any interaction between Mother and D.D. did not escalate to a physical altercation. She indicated that while the safety plan was in place, additional concerns arose related to the "very deplorable" condition "inside the home" — i.e., "trash stacked on trash, clothes piled up, toys piled up everywhere . . . the sink . . . full of dishes, and . . . flies, bugs, all throughout the house" — the older children not attending school regularly, and emotional abuse, leading the agency to seek temporary custody of the children. Patterson stated that, at that time, the agency made referrals for Community Collaborative services, for family counseling, and for individual counseling for the older children, but that the family was not "consistently compliant" with services.

{¶ 15} With respect to the family's prior involvement with the agency, Patterson explained that the three oldest children had been previously adjudicated

in 2013 and that two of the parents' other children had been previously committed to the permanent custody of the agency. In addition, Patterson stated that while three of Grandmother's other grandchildren were in her care (when they were in the legal custody of another relative), these children became "[c]ourt involved" and were ultimately placed in the permanent custody of the agency.[5]

{¶ 16} Patterson explained that the case-plan objectives for Mother involved parenting, family counseling, and housing and that the case-plan objectives for Grandmother involved parenting, family counseling, housing, and making sure that the children attended school daily and attended all medical appointments.

{¶ 17} Patterson explained that the purpose of family counseling was to facilitate communication between the adults and the children, i.e., to teach the adults "how to communicate with the children and . . . to use certain therapy tools, like how to redirect the children when the children do become disrespectful to them, or if they become frustrated in how the children [are] reacting to them." Patterson testified that although the family had been engaged in family counseling through the National Youth Advocate Program ("NYAP") from approximately May 2024 to October 2024, she did not see any indication that behaviors were improving and that she did not believe Mother or Grandmother had made significant progress on that element of their case plans. Patterson testified that family counseling was

---

[5] No other testimony was presented as to when this occurred, the ages of the children, or the circumstances that led to the children becoming "[c]ourt involved" and placed in the permanent custody of CCDCFS. However, copies of the journal entries from these cases were included in the exhibits submitted by CCDCFS.

discontinued in October 2024 because the therapist indicated "in her professional opinion that the family was not benefiting from family therapy."

{¶ 18} Morales testified that when she was assigned to the case, she made an additional referral for family counseling through Choices Behavioral and that Mother, Grandmother, and the older children reengaged in family counseling in May 2025. She indicated that the gap in family-counseling services was because of difficulties in locating a provider and scheduling issues.

{¶ 19} Patterson testified that the family had two hours of supervised visitation each week and that visitation was initially held at Community Collaborative but was later moved to Mother and Grandmother's home. Patterson stated that Mother and Grandmother were consistent with visitation. She explained that the visits were supervised because of Mother and Grandmother's lack of parenting skills, "[t]he kids not looking at them as like a parental figure, the kids being disrespectful, [and] the parents not being able to redirect the children." She indicated that during visits, sometimes the siblings "would get along and sometimes they wouldn't." She described the interactions between the adults and the children during visits as "very chaotic," "not being able to communicate with each other," and the children "cussing them out." She indicated that the older children (in particular D.D. and Sa.D.) would be "bickering" and "getting into it," "fighting amongst each other," "their trauma . . . coming out during visits," such that she would have to step in and advise the adults that the children need to be redirected. She stated that "the majority of the time, the parents would ignore it or dismiss what [the children were]

saying, how they're feeling" and that there had been "quite a few . . . emotional outbursts, emotional breakdowns from the children because they are feeling that their parents are not being supportive of what they are experiencing or how they're feeling." She indicated that the parents would often "reward the children with things" even though the children were not cooperating and were disrespectful to the parents and that the adults would also engage in "inappropriate conversations" with the children at visits, such as telling the children that their dog had died, causing the children to become "highly upset," even though the parents were in therapy to learn how to properly relay information to the children.

{¶ 20} Morales offered a similar view of visitation. She testified there was "a lot of conflict" between the older girls during visitation, who would be cursing, "calling each other out," and "disagreeing with . . . what the adults were telling them." She stated that this would impact the younger children, who were observing the conflict, and that the younger children would sometimes repeat what their older siblings were saying. She indicated that Mother would, at times, seek to intervene to redirect the children but that her efforts were often unavailing. She stated that D.D. and Sa.D. would also attempt to interfere with Mother's parenting of the younger children, acting as if they were the parents of the younger children rather than Mother, and that Mother was unable to successfully redirect them when this occurred. Morales testified that Mother was clearly bonded with J.D. and K.D. and, at times, also showed affection for the older children.

{¶ 21} With respect to Grandmother, Patterson testified that although Grandmother had a bond with all three older children, she had an especially strong bond with St.D. and, during visitation, "would mainly be attentive" to him. Morales testified that Grandmother attempted to engage with all the older children during visits but that, at times, "it shows like she's more engaged with [St.D.]," causing D.D. and Sa.D. to feel jealous, which "could cause conflict between them."

{¶ 22} Patterson stated that Mother and Grandmother had each completed two parenting programs — a regular parenting program and a nurturing parenting program. Patterson testified that she had attempted to make arrangements for a parenting coach for supportive visitation but that, because of an issue with the agency's contracts with the foster network — i.e., because the "foster agencies who ha[d] the children under them" did not offer parenting coaches — she was not able to put supportive visitation in place and "nothing ever came of it." Both she and Morales acknowledged that Mother and Grandmother were willing to engage in recommended services.

{¶ 23} Patterson stated that although she received "positive" reports from providers regarding Mother and Grandmother's participation in parenting classes, she did not believe that they had benefited from the parenting classes and, therefore, did not believe they had made significant progress on the parenting elements of their case plans. Patterson indicated that she had continuing concerns regarding whether Grandmother would be able to meet the children's educational needs if they were reunified with her, including ensuring the children consistently attended school,

completed their homework, and turned it in on time, based on Grandmother's failure to attend St.D.'s individualized education program ("IEP") meetings or "participate[] in some of the concerns that they may have had throughout the school year"; failure to ask the children, the foster parents, or the case worker about the children's educational needs, goals, and progress; and failure to assist the children with their homework during visits without being prompted by the case worker to do so.[6]

{¶ 24} Morales stated that, in her view, Mother's and Grandmother's behaviors were not "the types of things you would expect to see from people who have completed two parenting courses." She indicated that Grandmother and Mother never discussed school with the children unless the children mentioned school and that if the children were returned to Mother or Grandmother, she did not believe their educational needs would be consistently met "[d]ue to the past history with the children not going to school." Both Patterson and Morales testified that Mother and Grandmother were not at a point where they could recommend unsupervised or overnight visits with the children.

{¶ 25} Patterson testified that the agency made referrals to CMHA and Community Collaborative to assist Mother and Grandmother with housing and that they used the Community Collaborative referral to obtain housing. Patterson stated that when Mother moved in with Grandmother after separating from Father, this

---

[6] Patterson acknowledged, however, that Grandmother had not been notified of the IEP meetings.

posed a potential barrier to reunification because D.D. "did not want to live with mother," "[s]he feared to live with mom, and she didn't want to stay with the mom," so Patterson explained to Mother that Mother needed to find housing independent from Grandmother.

{¶ 26} Patterson indicated that although Grandmother had been evicted from her home in September 2024, she and Mother found another home and had been living in that three-bedroom home continuously since November 2024. She stated that Mother's 20-year-old disabled and "medically fragile" son was also living in the home; Grandmother was his legal guardian and received a social security disability payment as his caregiver. Patterson indicated that, in her view, neither Mother nor Grandmother had made significant progress on the housing case-plan objective because when she last saw the house in or around November 2024, they "still had, like, items or just things just stacked in different areas in the home," "things stacked on top of each other . . . [e]verything, like, toys, clothes, books, just piles of things, just everywhere," and did not have the necessary furnishings for all five children. Patterson stated, however, that she had not observed any rotten food, rodents, insects, or anything else that would present a health issue in the home. Patterson testified that utilities were on and there were no concerns regarding Mother or Grandmother's ability to provide sufficient food for the children. Morales similarly described the condition of the home as "cluttered," "like, bags of stuff, toys, clothes . . . on surfaces[,] on the floor, the couch, in the living room. So it's like all over basically." She stated that the home seemed to get "more cluttered" the longer

she was on the case, but indicated that the home was not in such a state as to put the children at risk and that weekly visits had been held in the home since at least November 2024.

{¶ 27} With respect to the children's placements, Patterson testified that the two oldest children, D.D. and Sa.D., had been placed in the same foster home; that they had "bond[ed] well" with their foster caregivers; that they respected, listened to, and communicated with their foster caregivers; and that they followed the rules of the household. She indicated that the children attended school regularly, that they completed their classwork and homework, and that they "did really good in school." She stated that D.D. received individual counseling and that Sa.D. received individual and group counseling (both for "behavioral issues" and "to address the trauma") and that their foster caregivers ensured that the children were consistently engaged in counseling services. Patterson testified that whereas Sa.D. had difficulties communicating with Mother and Grandmother regarding "certain things that she felt like she wanted to communicate," when the foster parents communicated with Sa.D., "it'd be a whole different other story. Like, she didn't have an issue. She didn't have a problem."

{¶ 28} Morales testified that when she observed D.D. and Sa.D. in their foster placement, "they're always talking to each other normally, no disagreement," that they did not exhibit the behaviors in the foster home that they showed at visits, and that the girls were "well adjusted" and had "no concerns," "as if they're different

children between the ones in the foster home and at family visits." According to Patterson, their caregivers had not expressed an interest in adopting D.D. or Sa.D.

{¶ 29} Patterson testified that the two youngest children, K.D. and J.D., had been placed in one foster home from July 2023 until January 2024 and were then placed together in a second foster home. She indicated that the children had "structure" and "stability" in the foster home and had "bonded very well" with their caregivers, who had expressed an interest in adopting them. Morales similarly testified that K.D. and J.D. were "bonded with" and "attached to" their foster caregivers. She indicated that because the children exhibited negative behaviors and were, at times, "defiant" after visitation, "play counseling" had been recommended for the children, which the agency was in the process of scheduling.

{¶ 30} St.D. had multiple placements while in temporary custody. Patterson testified that St.D. had initially been placed in a group home as a temporary placement, then in two foster homes, before being placed in Genacross, a residential group home in Toledo, in September or October 2024. Patterson and Morales indicated that Mother and Grandmother visited with St.D. regularly and that he continuously expressed a desire to return to Grandmother's custody.

{¶ 31} Patterson testified that, while in counseling, St.D. disclosed to a therapist that he had been sexually abused by a male family member (no one involved in the case) and that his "trauma [had] started coming out" in the form of sexual sounds, sexual statements to peers at school, and sexualized behaviors that ultimately led to his being removed from foster placement and placed in Genacross

for treatment.[7]  Morales described an incident involving a peer in school for which St.D. could have been criminally charged but the family of the peer declined to pursue the matter.  Morales testified that St.D. had been diagnosed with ADHD and had an IEP, that he participated in individual counseling once or twice a week and group therapy five times a week, that his individual therapy incorporated specialized therapy to address his sexualized behaviors, and that he was prescribed medication with which he was compliant.  Morales stated that it was unknown when St.D. would complete his treatment at Genacross.  She indicated that there were still issues with St.D.'s behaviors, that he would be in need of therapy for the foreseeable future, and that she believed St.D. posed a risk to the safety and well-being of the other children and his disabled older brother if he were to return home.  Morales stated that the therapeutic services Genacross provided to St.D. could be provided elsewhere if St.D. were to return home but that she did not believe St.D. would, in fact, receive necessary services if he returned home.

{¶ 32} Morales discussed the proposed sleeping arrangements if all five children were to return to the home and indicated that she did not believe there was adequate space or furnishings for all of the children.  In particular, she noted that

_____

[7] Morales testified that this behavior included "humping furniture," stealing and wearing peers' clothing and undergarments, spending excessive amounts of time in his room or the bathroom, and "excessive masturbation."

Patterson testified that the abuse occurred while St.D. was in Grandmother's custody.  No evidence was presented as to the date, location, or circumstances of St.D.'s abuse or the identity of the perpetrator.  Patterson testified that a police report had been filed but that no one had been charged with a criminal offense against St.D.

the room proposed to be used by St.D. did not have a door, raising concerns regarding lack of privacy and St.D.'s tendency to expose others to his sexualized behaviors.

{¶ 33} Patterson testified that although the agency had attempted to identify other relatives or interested persons with whom to place the children, no one suitable had been identified. Patterson stated that, in her opinion, the agency should be granted permanent custody of all five children because "the kids have made progress being in a home where they are able to receive structure, discipline, stability. The kids were able to flourish . . . in these environments." She further indicated that she did not believe Mother or Grandmother would be able to successfully enforce rules with the children and that that was something they would need to do to ensure that the children's educational needs were met if the children returned home. Morales likewise stated that, in her view, granting permanent custody to the agency would be in the best interest of all five children.

{¶ 34} Morales testified that she had discussed the issue of reunification with both Mother and Grandmother and that neither had expressed a desire to have custody of all five children. She stated that Mother informed her that she wished to reunify with J.D. and K.D. and that Grandmother informed her that she wished to reunify with the three oldest children.

### 2. Mother's Witness

{¶ 35} Hooper, Mother's therapist, was Mother's sole witness. Hooper provided brief testimony regarding her telehealth-counseling sessions with Mother.

She stated that she began working with Mother in June 2025, that Mother "consistently" attended video-counseling sessions, that the sessions were "productive," that Mother "showed progress" as they worked on "her treatment goal plan," and that Mother was continuing to engage with treatment. Hooper indicated that she had never seen Mother interact with her children.

### 3. Recommendation of the Guardian Ad Litem

{¶ 36} The guardian ad litem recommended that the agency be granted permanent custody of all five children. She indicated that there were "a lot of moving parts" and she had "seriously considered" whether "the kids could be split up and different things could be arranged" for one or more of the children to return home, but that, ultimately, she did not think returning home would be in any of the children's best interests "because of the continuing concerns all together that ha[d] been brought up to the Court's attention."

{¶ 37} The guardian ad litem reported that although she had not attended as many visits as the CCDCFS case workers, she did not witness the behaviors by the older children described by Patterson and Morales. The guardian ad litem stated that, in her view, although it was "chaotic with a bunch of kids," they were "all acting age appropriate," i.e., "that's how it is when you have a family, a large family," and that she did not have any "issues" or "ongoing concerns with that." The guardian ad litem indicated that her "biggest concern" was "the safety and the sleeping of the children in the home."

{¶ 38} With respect to St.D., the guardian ad litem reported that Genacross is "a facility that helps children with behaviors where they can't be placed anywhere else." She noted that St.D. has stated that "he wants to return home to [G]randma and that he would like to go back as soon as possible," but that, "[u]nfortunately, due to his behaviors," that is not "an option." She explained: "He's got a serious case of ADHD. . . . He doesn't want to listen. He doesn't want to follow directions. He disconnects from reality. He, I mean, yes, he's acting out sexually, but there's so much more. . . . [H]e doesn't want to go to school. And if he wasn't forced, he wouldn't."

{¶ 39} She stated that St.D.'s providers "have not said that he can be released," that he still needs inpatient treatment, and that she has concerns about the harm that could result from potential interactions between St.D. and other children and/or his disabled older brother if he were to return home.

{¶ 40} With respect to D.D. and Sa.D., the guardian ad litem reported that D.D. is happy in her placement, that all of the girls' needs are being met, that the foster parents put a lot of structure in place and help the girls as much as possible, and that D.D. has indicated that she does not want to return home. The guardian ad litem reported that Sa.D. initially "had issues" in her placement, feeling as if there was "a lot of animosity toward her" because she identifies as "they" and "them" and "likes to dress as an animal," but that those issues were addressed. The guardian ad litem indicated that Sa.D. was allegedly abused by the same person who abused

St.D., that Sa.D. has "ongoing issues and concerns" and sometimes "acts out," and that she is engaged in "specialized treatment for her behavior."

{¶ 41} The guardian ad litem reported that Sa.D. had also expressed a desire to return home to Grandmother but that "the concerns that brought this case to the [c]ourt and the [a]gency," "the sexual trauma that happened to her," and "the interaction with her mom in the previous case" were continuing causes for concern and that the guardian ad litem did not believe it would be in Sa.D.'s best interest to return home, "just her." The guardian ad litem acknowledged that "[Sa.D's] older and she's on a whole different path and plan than any of the other kids. So I mean, her situation's different." She indicated that if the court were inclined to return Sa.D. to Grandmother's custody with protective supervision, "that would be something that I think would be okay for her," but that she "would just be cautious" "in case any concerns happened again with schooling or acting out or conflict in the home" and to make sure Sa.D. continued to receive counseling.

{¶ 42} With respect to J.D. and K.D., the guardian ad litem reported that they were placed in a home with nine children and that they were "really happy" there and "really bonded" with their caregivers. The guardian ad litem stated that although they love Mother and want to see her, they also say they want to stay where they are and are too young to properly articulate their wishes. The guardian ad litem stated that, given Mother's history and continuing concerns, she was not certain whether basic needs would be met "just having the two little ones return home to the home right now . . . just them and with mom."

## B. The Juvenile Court's Decision

{¶ 43} On September 3 and 4, 2025, the juvenile court journalized judgment entries in each child's case denying Mother's motion for legal custody, granting the agency's motion for permanent custody, terminating Mother's and Father's parental rights as to all five children, and terminating Grandmother's legal custody of D.D., Sa.D., and St.D.

{¶ 44} Mother appealed (Appeal No. 115605), raising the following two assignments of error for review as to all five children:

> Assignment of Error No. 1:
>
> The trial court's judgments granting permanent custody [to] the agency were not based upon sufficient clear and convincing evidence, were against the manifest weight of the evidence, and the findings of permanent custody are not in the best interests of the five children.
>
> Assignment of Error No. 2:
>
> The trial court erred in denying the mother's motion for legal custody.

{¶ 45} Grandmother also appealed (Appeal No. 115622), raising the following two assignments of error for review as to D.D., Sa.D., and St.D.:

> Assignment of Error No. 1:
>
> The trial court committed reversible error when it granted permanent custody of the minor children to the Cuyahoga County Division of Children and Family Services, as its decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence, in violation of R.C. 2151.414.
>
> Assignment of Error No. 2
>
> The trial court committed reversible error by finding that permanent custody to Appellee was in the best interest of the children, where the

evidence demonstrated that a fit, willing, and appropriate relative—Appellant-Grandmother—was available for placement.

We have consolidated these appeals for disposition.

## II. Law and Analysis

### A. Standing

{¶ 46} Before we consider the merits of these appeals, the agency has raised an issue of Grandmother's standing to appeal. "[O]nly aggrieved parties have standing to appeal." *In re An.M.*, 2022-Ohio-2873, ¶ 23 (8th Dist.), citing *Goodman v. Hanseman*, 2012-Ohio-1587, ¶ 1 ("To have appellate standing, a party must be "'aggrieved by the final order appealed from.'''"), quoting *State ex rel. Merrill v. Ohio Dept. of Natural Resources*, 2011-Ohio-4612, ¶ 28, quoting *Ohio Contract Carriers Assn., Inc. v. Pub. Util. Comm.*, 140 Ohio St. 160 (1942), syllabus. "'Generally, a party cannot appeal an alleged violation of another party's rights. However, "an appealing party may complain of an error committed against a non-appealing party when the error is prejudicial to the rights of the appellant."'" *In re Th.W.*, 2005-Ohio-2852, ¶ 13 (8th Dist.), quoting *In re Mourey*, 2003-Ohio-1870, ¶ 20 (4th Dist.), quoting *In re Smith*, 77 Ohio App.3d 1, 13 (6th Dist. 1991).

{¶ 47} The agency asserts that because Grandmother is "a non-parent and former legal custodian," she "possesses no residual rights to the children that might have been affected by the decisions of the trial court" and, therefore, lacks standing to appeal the juvenile court's permanent-custody order "in relation to her claims."

**{¶ 48}** Grandmother was granted legal custody of D.D., Sa.D., and St.D. by court order in 2015. R.C. 2151.011(B)(21) defines "[l]egal custody" as

> a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities.

Thus, as D.D., Sa.D., and St.D.'s legal custodian, Grandmother had rights as the children's legally recognized caretaker, which were subject only to the residual rights of their parents. Legal custody is intended to be permanent. *See* R.C. 2151.42(B); *see also In re A.P.*, 2012-Ohio-3873, ¶ 17-35 (9th Dist.) (where agency did not seek to terminate or modify prior legal custody order under R.C. 2151.42(B), grandmother did not lose her status as child's "custodian" as it related to reunification and case-plan efforts when the juvenile court later placed the child in the temporary custody of the agency); *In re E.E.D.*, 2022-Ohio-4014, ¶ 48 (8th Dist.).

**{¶ 49}** The juvenile court's permanent-custody orders not only terminated Mother's and Father's parental rights but also expressly terminated Grandmother's rights as legal custodian of D.D., Sa.D., and St.D. Although Grandmother, as a nonparent, former legal custodian, lacks standing to challenge the juvenile court's permanent-custody order to the extent it terminates Mother's and Father's parental rights, *see, e.g., In re Ez.D.*, 2021-Ohio-3041, ¶ 16-17 (8th Dist.), she would have standing to challenge the permanent-custody order as it relates to the termination

of her rights as legal custodian of D.D., Sa.D., and St.D. *See, e.g., In re E.E.D.* at ¶ 46-49; *In re K.S.*, 2025-Ohio-4773, ¶ 16 (2d Dist.); *In re C & C*, 2022-Ohio-3751, ¶ 21 (1st Dist.).

{¶ 50} In her assignments of error, Grandmother asserts that the juvenile court "committed reversible error" in (1) granting permanent custody of her grandchildren to the agency because "its decision was not supported by clear and convincing evidence and was against the manifest weight of the evidence, in violation of R.C. 2151.414" and (2) finding that permanent custody was in the children's best interest because "the evidence demonstrated that a fit, willing, and appropriate relative," i.e., Grandmother, "was available for placement."

{¶ 51} Likewise, in her appellate brief, Grandmother's arguments are directed to the termination of Mother's and Father's parental rights — not the juvenile court's ruling terminating her legal custody rights — as to D.D., Sa.D., and St.D. *See, e.g.,* Grandmother's appellate brief at 14 ("It is our position today that the Appellee has not met its burden under R.C. 2151.414(B) to justify the termination of parental rights and the grant of permanent custody."). Grandmother does not reference the standard applicable to legal-custody determinations or any other legal authority related to the termination of legal-custody rights in her appellate brief. At oral argument, Grandmother's counsel confirmed that Grandmother was challenging only the termination of Mother's parental rights as to D.D., Sa.D., and St.D. — not the failure to return the children to Grandmother's legal custody.

Because Grandmother lacks standing to challenge the termination of Mother's parental rights, we dismiss Grandmother's appeal.

## B. Requirements for Granting Permanent Custody to CCDCFS

{¶ 52} Under R.C. 2151.414(B)(1), a juvenile court may grant a public children-services agency's motion for permanent custody if it determines, by clear and convincing evidence, that (1) permanent custody is in the best interest of the child and (2) any of the following circumstances exists:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.
>
> (b) The child is abandoned.
>
> (c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.
>
> (d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.
>
> (e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated

an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

{¶ 53} "Clear and convincing evidence" is that "'measure or degree of proof'" that "'produce[s] in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established.'" *In re Z.C.*, 2023-Ohio-4703, ¶ 7, quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. "It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." (Emphasis deleted.) *Cross* at 477.

{¶ 54} R.C. 2151.414(D) sets forth the factors a juvenile court is to consider in determining what is in the best interest of a child in a permanent-custody hearing. R.C. 2151.414(D)(1) states that in determining whether permanent custody is in a child's best interest, the court "shall consider all relevant factors," including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period . . . ;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]

(e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.[8]

{¶ 55} The best-interest determination focuses on the child, not the parent. *In re N.B.*, 2015-Ohio-314, ¶ 59 (8th Dist.). Although the juvenile court is required to consider each relevant factor in determining what is in a child's best interest, no one factor is required to be given greater weight than the others. *In re A.L.*, 2024-Ohio-1992, ¶ 31 (8th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 56. Further, only one of the factors needs to be resolved in favor of permanent custody to find that permanent custody is in the child's best interest and terminate parental rights. *In re R.M.*, 2024-Ohio-1885, ¶ 60 (8th Dist.); *In re N.B.* at ¶ 53.

{¶ 56} A juvenile court's decision to grant permanent custody of a child to CCDCFS is reviewed under sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards of review depending on the nature of the arguments presented. *In re Z.C.*, 2023-Ohio-4703, at ¶ 11; *In re T.W.*, 2026-Ohio-124, ¶ 44 (8th Dist.). Mother raises both types of challenges here.

---

[8] In addition to the best-interest factors identified in R.C. 2151.414(D)(1), R.C. 2151.414(D)(2) sets forth a list of circumstances that, if all are found to exist, mandates a finding that permanent custody is in the best interest of the child. R.C. 2151.414(D)(1) and (D)(2) are alternative means for determining whether permanent custody is in a child's best interest. *In re Za.S.*, 2023-Ohio-1477, ¶ 60 (8th Dist.). Because the juvenile court's analysis here was limited to the factors under R.C. 2151.414(D)(1), we do not address R.C. 2151.414(D)(2).

## C. The Juvenile Court's Findings

{¶ 57} In awarding permanent custody to the agency, the juvenile court found that R.C. 2151.414(B)(1)(d) and (e) applied, i.e., that as of the time the agency filed its motion for permanent custody on September 19, 2024, the children had been in temporary custody for 12 or more months of a consecutive 22-month period and that "[t]he child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state."

{¶ 58} R.C. 2151.414(B)(1) states: "For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." The record reflects that the children were placed in agency custody beginning in July 2023 and were adjudicated neglected or dependent on August 3, 2023. Accordingly, the record supports the juvenile court's finding under R.C. 2151.414(B)(1)(d) by clear and convincing evidence. Mother does not dispute the juvenile court's finding under R.C. 2151.414(B)(1)(d); however, she challenges the juvenile court's finding under R.C. 2151.414(B)(1)(e) on the grounds that the exhibits CCDCFS introduced to support that finding were not "discussed," "identified," or "used at the hearing" and the juvenile court's judgment "does not specify the child/children adjudicated three times."

{¶ 59} R.C. 2151.414(B)(1)(d) and (e) are alternative findings. Only one is required to support the granting of permanent custody to the agency. Given that Mother concedes the condition in R.C. 2151.414(B)(1)(d) was met, we need not address the juvenile court's finding under R.C. 2151.414(B)(1)(e).

{¶ 60} In its September 3, and 4, 2025 journal entries, the juvenile court identified the specific factors it considered, including all of the factors specified in R.C. 2151.414(D)(1), in determining that permanent custody was in the children's best interest. The juvenile court explained:

> With respect to the best interest of the child, the Court has considered the following factors under O.R.C. 2151.414(D)(1):
>
> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, and foster caregivers and out-of-home providers, and any other person who may significantly affect the child.
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child. *GAL recommendation is for permanent custody to CCDCFS*.[9]
>
> (c) The custodial history of the child, including whether the child has been in temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition for twelve or more months of a consecutive twenty-two month period.
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.
>
> (e) Whether any factors in divisions (E)(7) to (11) of this section apply in relation to the parents and the child.

---

9 In the judgment entry for the case involving D.D., the juvenile court further found, as to the wishes of the child, that "per the child's attorney, this child is in agreement as well."

**{¶ 61}** The juvenile court also found "by clear and convincing evidence" that the children cannot be placed with one of their parents or Grandmother within a reasonable time or should not be placed with either parent or Grandmother, based on the following findings pursuant R.C. 2151.414(E)(1), (11), and (16):

> (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. *Applies to the mother, father, and legal custodian.*
>
> (11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Ohio Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child. *Applies to the mother.*
>
> (16) *Any other factors the Court considers relevant: There is a lack of consistent engagement or demonstrated benefit from case plan services, the Legal custodian and Mother reside together and neither have demonstrated it would be in the best interest of this child to return to either of their care or custody.*[10]

---

[10] The findings in the judgment entries related to J.D. and K.D. removed the references to the legal custodian. For example, in those cases, the juvenile court's finding as to R.C. 2151.414(E)(16) states: "(16) *Any other factors the Court considers relevant: There is a lack of consistent engagement or demonstrated benefit from case plan services by Mother.*" With respect to the juvenile court's statement (in its finding under R.C. 2151.414(E)(16) in the judgment entries relating to D.D., Sa.D., and St.D.) that "neither [Mother nor Grandmother] have demonstrated it would be in the best interest of this child to return to either of their care or custody," as the agency concedes, it was not Mother or Grandmother's burden to prove that it would be in the children's best interest to return the children to their care or custody. However, because (1) Mother has not challenged this statement in her appellate brief and (2) for the reasons stated below, the juvenile court's

The child's continued residence in or return to the home of the mother, [T.C.], the father, [S.D.], and the legal custodian, [T.H.], would be contrary to the child's best interest.

{¶ 62} As to R.C. 2151.414(E)(16), the juvenile court further found as to St.D. that "[t]here would not be an adequate space for this child to reside with them safely, the child is in residential treatment for behavioral concerns including significant sexualized behaviors."

### D. Mother's Challenges to the Juvenile Court's Findings

{¶ 63} In her first assignment of error, Mother contends the juvenile court's judgment terminating her parental rights should be reversed because its determination that permanent custody was in the children's best interest was not supported by clear and convincing evidence and was against the manifest weight of the evidence.

{¶ 64} "'[S]ufficiency is a test of adequacy.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). When applying a sufficiency-of-the-evidence standard, an appellate court should affirm a trial court when the evidence is legally sufficient to support the factfinder's determination as a matter of law. *In re Z.C.* at ¶ 13.

{¶ 65} Weight of the evidence, on the other hand, "'"is not a question of mathematics, but depends on its effect in inducing belief."'" (Emphasis deleted.) *Id.*, quoting *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed. 1990).

---

best-interest determination is otherwise supported by clear and convincing evidence and is not against the manifest weight of the evidence, we do not further address the issue here.

When reviewing a juvenile court's decision regarding permanent custody for manifest weight of the evidence,

> the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*Eastley v. Volkman*, 2012-Ohio-2179,] ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Id.* at ¶ 21. "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 10 Ohio B. 408, 461 N.E.2d 1273 (1984). "'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the verdict and judgment.'" *Id.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-192 (1978).

*In re Z.C.* at ¶ 14.

{¶ 66} Mother contends that the juvenile court's best-interest determination was not supported by clear and convincing evidence and was against the manifest weight of the evidence because (1) "[w]ith respect to the interaction and interrelationship of the children with the Mother, the evidence was in favor of this factor for the Mother"; (2) Mother had been "consistently involved with the children through visits, therapy, etc.," had "substantially completed her case plan," and was "willing to do whatever is asked of her"; (3) Mother and Grandmother are "able to provide a home, love, support and education for the children"; and (4) permanent custody should not have been granted for all five children "when one, some, or all of

the children could come back to [Mother and/or Grandmother] with protective supervision."

{¶ 67} Mother also specifically challenges the juvenile court's findings under R.C. 2151.414(E)(1), (11), and (16) and its determination that the children could not be placed with Mother within a reasonable time or should not be placed with Mother. She argues that "the evidence presented proved Mother is willing to engage in services to their completion; a Mother who was present for her children; a Mother who was trying, completed parenting two times and sought the help of OhioGuidestone; and a Mother whom the children loved." Mother further contends that "[t]he agency must make reasonable efforts to reunify the family prior to termination of parental rights" and that "[t]o the extent there was any deficiency in . . . Mother's case plan," it was because the agency did not do more to support successful reunification, including providing a parenting coach and giving Grandmother "a chance to ensure the children went to school."

### 1. The Juvenile Court's Determination that the Children Could Not be Placed with Mother within a Reasonable Time or Should Not be Placed with Mother

{¶ 68} With respect to the juvenile court's determination that the children could not be placed with Mother within a reasonable time or should not be placed with Mother, we first address the juvenile court's finding under R.C. 2151.414(E)(11). Uncontroverted evidence was presented through witness testimony and judgment entries that two of Mother's other children had been previously committed to the permanent custody of CCDCFS. Because Mother previously had her "parental rights

involuntarily terminated with respect to a sibling" of the children, Mother had the burden under R.C. 2151.414(E)(11) to prove by clear and convincing evidence that, notwithstanding the prior termination, she could "provide a legally secure permanent placement and adequate care for the health, welfare, and safety" of the children. *See, e.g., In re M.A.*, 2025-Ohio-4473, ¶ 27 (8th Dist.); *In re J.H.*, 2017-Ohio-940, ¶ 22 (8th Dist.); *see also In re A.W.*, 2022-Ohio-3715, ¶ 23 (1st Dist.) ("R.C. 2151.414(E)(11) allows a parent to rebut the presumption — created by the previous involuntary termination — that he or she is an unfit parent."); *In re M.J.*, 2024-Ohio-1261, ¶ 17 (9th Dist.) (interpreting R.C. 2151.414(E)(11) as requiring a parent "to present clear and convincing evidence of his or her current ability, at the time of the hearing, to provide an appropriate home for the child"); *In re K.R.*, 2023-Ohio-936, ¶ 39 (8th Dist.) ("R.C. 2151.414(E)(11) allows a parent to establish that despite the prior ruling, they can now provide a legally secure placement and adequate care for the health, welfare, and safety of the child.").

{¶ 69} The record supports the juvenile court's determination that Mother failed to meet her burden.

{¶ 70} Aside from her counsel's cross-examination of the CCDCFS case workers, the only evidence Mother presented at the permanent-custody hearing was the testimony of her therapist. As detailed above, Mother's therapist merely indicated that Mother had consistently attended video-counseling sessions since June 2025 and was showing progress on "her treatment goal plan." Although Mother's decision to engage in counseling was laudable, individual counseling was

not an element of Mother's case plan. The therapist did not identify Mother's treatment goals or explain how, if at all, they related to these cases. The therapist never observed Mother with the children.

{¶ 71} The testimony of Patterson and Morales did not support Mother's claim that she could provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the children. Although the record reflects that Mother had obtained housing by living with Grandmother, had completed parenting classes, and had participated in family counseling, after more than two years of services, she was still not in a position where she could have unsupervised visits or overnight visits with the children, much less in a position to have the children returned to her care and custody — and there was nothing in the record to suggest that she would be in a position to do so at any reasonable time in the future. Despite Mother's claims of compliance with case-plan services, even substantial compliance with case-plan services is not, in and of itself, "dispositive on the issue of reunification" and "does not preclude a grant of permanent custody to a social services agency." *In re J.B.*, 2013-Ohio-1704, ¶ 90 (8th Dist.); *see also In re R.D.*, 2022-Ohio-4519, ¶ 59 (8th Dist.). Simply because a parent completes services identified in a case plan does not mean he or she has achieved the objectives of the case plan related to those services or has substantially remedied the conditions that caused the child to be removed from the home. *See, e.g., In re J.B.* at ¶ 90; *In re C.C.*, 2010-Ohio-780, ¶ 25 (8th Dist.) ("A parent can successfully complete the terms of a case plan yet not substantially remedy the conditions that caused the children

to be removed — the case plan is simply a means to a goal, but not the goal itself. . . . [T]he successful completion of case plan requirements does not preclude a grant of permanent custody to a social services agency."). "'The issue is not whether the parent has substantially complied with the case plan, but whether the parent has substantially remedied the conditions that caused the child's removal.'" *In re J.B.* at ¶ 90, quoting *In re McKenzie*, 1995 Ohio App. LEXIS 4618, *11 (9th Dist. Oct. 18, 1995); *In re R.D.* at ¶ 59.

{¶ 72} Mother had not had custody of the three oldest children since 2013. The record reflects that there were serious, unresolved concerns regarding Mother's ability to appropriately address conflict with and among the children, to appropriately discipline and parent the children, and to provide a safe, secure, and appropriate home environment for them. After more than two years, the family's interactions remained chaotic during their weekly, two-hour supervised visits and were marked by (1) emotional outbursts, breakdowns, and fighting; (2) a perceived lack of support from Mother and Grandmother; and (3) the inability of the family to effectively communicate with one another — notwithstanding their engagement in family counseling.

{¶ 73} "'A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs.'" *In re Z.F.*, 2024-Ohio-1698, ¶ 45 (1st Dist.), quoting *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). While Mother may have affection for the children and a desire to be a

supportive parent, the record supports the juvenile court's determination that she had not met her case-plan objectives and that Mother did not present clear and convincing evidence that she was able to provide a legally secure placement and provide for the health, welfare, and safety of all or some of the children.

{¶ 74} The juvenile court's finding under R.C. 2151.414(E)(11) as it relates to Mother was supported by sufficient evidence and was not against the manifest weight of the evidence. Where the juvenile court finds, by clear and convincing evidence, that at least one of the factors specified in R.C. 2151.414(E) exists as to each of the child's parents, the juvenile court "shall" find that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. R.C. 2151.414(E). Accordingly, the juvenile court was required to find that the children could not be placed with Mother within a reasonable time or should not be placed with Mother. Because a court need only find that one of the R.C. 2151.414(E) factors applies to compel a finding that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent, we need not address Mother's challenges to the juvenile court's findings under R.C. 2151.414(E)(1) and (16) pertaining to Mother. R.C. 2151.414(E); *In re A.E.*, 2025-Ohio-1466, ¶ 14 (8th Dist.); *In re L.V.*, 2024-Ohio-5917, ¶ 53 (8th Dist.).

### 2. Mother's Challenge to the Juvenile Court's Reasonable-Efforts Determination

{¶ 75} With respect to Mother's claim that agency failed to make reasonable efforts to reunify her with her children, the record supports the juvenile court's

determination that reasonable efforts were made to reunify Mother with her children.[11]

{¶ 76} "Reasonable efforts means that a children's services agency must act diligently and provide services appropriate to the family's need to prevent the child's removal or as a predicate to reunification." *In re H.M.K.*, 2013-Ohio-4317, ¶ 95 (3d Dist.), quoting *In re D.A.*, 2012-Ohio-1104, ¶ 30 (6th Dist.). What constitutes "reasonable efforts" varies with the circumstances. *In re C.B.C.*, 2016-Ohio-916, ¶ 76 (4th Dist.). "The issue in a reasonable-efforts determination is not whether the agency could have done more, but whether the agency's case planning and efforts were reasonable and diligent under the circumstances of the case." *In re A.F.*, 2021-Ohio-4519, ¶ 35 (8th Dist.). "Reasonable efforts" does not mean "'all available efforts.'" *In re J.B.*, 2020-Ohio-3675, ¶ 21, quoting *In re Lewis*, 2003-Ohio-5262, ¶ 16 (4th Dist.). "Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible." *Lewis* at ¶ 16; *accord In re K.W.*, 2018-Ohio-3314, ¶ 45 (8th Dist.).

{¶ 77} As detailed above, the record shows that CCDCFS implemented a workable case plan that included parenting classes, counseling services, and

---

[11] Further, a juvenile court is not obligated to make a determination at the permanent-custody hearing that the agency used reasonable efforts to reunify the family, where, as here, the juvenile court had previously determined that reasonable efforts had been made. *In re C.F.* at ¶ 41, 43. In this case, reasonable-efforts determinations were made in the juvenile court's August 3, 2023 adjudication and temporary custody order, its April 14, 2024 order extending temporary custody, and at a February 2025 pretrial conference (in which the juvenile court noted in its February 12, 2025 journal entry, that "[a]ll parties stipulated to the reasonable efforts finding").

referrals for Community Collaborative services to address concerns regarding Mother's parenting, issues with inappropriate discipline, conflict within the home, and Mother's ability to provide a safe, stable, and appropriate home for the children. The evidence presented demonstrates that CCDCFS provided substantial services to Mother and worked with Mother for more than two years in an effort to reunite her with her children. Accordingly, Mother's arguments are meritless.

### 3. The Juvenile Court's Alleged Failure to Consider Legal Custody as an Alternative to Terminating Parental Rights

{¶ 78} In her first assignment of error, Mother also contends that the juvenile court's best-interest determination was not supported by clear and convincing evidence and was against the manifest weight of the evidence because evidence was presented that Mother and/or Grandmother was able to provide a suitable home, love, support, and education for the children and one or more of the children could have been returned to Mother and/or Grandmother's custody with protective supervision "as a less restrictive alternative to permanent custody."

{¶ 79} In her second assignment of error, Mother similarly challenges the juvenile court's denial of her motion to grant her legal custody of the children or, alternatively, to grant legal custody of the children to an unidentified "relative" (whom she claims is Grandmother), "reiterat[ing]" her prior arguments "as to why the best interest of the children was not permanent custody, but rather custody with her and/or [Grandmother]."

{¶ 80} "[A] child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security." *In re M.S.*, 2015-Ohio-1028, ¶ 11 (8th Dist.), citing *In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324 (1991). While courts must consider multiple factors in determining a child's best interest, "they are not required to find that termination is the 'only option' or that no suitable relative placement exists" before granting permanent custody to the agency. *In re C.J.F.-O.*, 2024-Ohio-6056, ¶ 31 (12th Dist.), citing *In re Schaefer*, 2006-Ohio-5513, ¶ 64 (The juvenile court's duty under R.C. 2151.414(D) does not "include the requirement that the juvenile court find by clear and convincing evidence that no suitable relative was available for placement. . . .The statute does not make the availability of a placement that would not require a termination of parental rights an all-controlling factor. The statute does not even require the court to weigh that factor more heavily than other factors."); *see also In re B.K.*, 2023-Ohio-1820, ¶ 31 (8th Dist.) ("'A juvenile court need *not* find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting an agency's motion for permanent custody.'"), quoting *In re C.H.*, 2016-Ohio-26, ¶ 26 (8th Dist.).

{¶ 81} In support of her arguments regarding a preference for relative placement, Mother cites to the agency's duties under Ohio Adm.Code 5101:2-42-05(E)(1) and (5) and (F). However, as this court has previously recognized, "OAC Section 5101 pertains to CCDCFS's obligations and its determination regarding substitute-care placement, rather than a trial court's permanent custody

determination." *In re S.C.*, 2018-Ohio-2523, ¶ 62 (8th Dist.), citing *In re J.F.*, 2018-Ohio-96, ¶ 36 (8th Dist.); *see also In re B.K.* at ¶ 31 ("While it may be preferential in custody actions that children be placed with an appropriate relative, the preference applies only to case plans and not to custody determinations."). "'[T]he willingness of a relative to care for a child does not alter what the court must consider in determining permanent custody'" and the juvenile court "'is not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody.'" *Id.* at ¶ 31, quoting *In re M.S.* at ¶ 11. If granting permanent custody to the agency is determined to be in a child's best interest, legal custody to a relative "necessarily is not." *In re Z.D.*, 2025-Ohio-969, ¶ 20 (8th Dist.); *In re D.E.*, 2025-Ohio-654, ¶ 15 (8th Dist.).

{¶ 82} The record shows that the juvenile court considered the relevant R.C. 2151.414(D)(1) factors, the evidence presented at trial, and the recommendation of the guardian ad litem in determining that permanent custody to the agency was in the children's best interest.[12] Despite Mother's arguments to the contrary, the record supports the juvenile court's best-interest determination as to all five children.

### a. J.D. and K.D.

{¶ 83} By the time of the permanent-custody hearing, the children had been in agency custody for more than two years and were in need of a safe, stable,

---

[12] Because the juvenile court found that R.C. 2151.414(E)(11) applied, it was required to again consider that factor in its best-interest analysis. R.C. 2151.414(D)(1)(e); *In re L.N.*, 2026-Ohio-1383, ¶ 50 (8th Dist.); *In re C.B.*, 2025-Ohio-5614, ¶ 26 (9th Dist.).

permanent placement. "[A] trial court's finding that it cannot or should not place a child with a parent precludes the court from considering returning the child to Mother's custody." *In re T.S.*, 2024-Ohio-827, ¶ 61 (8th Dist.), citing *In re E.J.*, 2023-Ohio-1376, ¶ 47 (8th Dist.), and *In re Mayle*, 2000 Ohio App. LEXIS 3379, *20-21 (8th Dist. July 27, 2000). Thus, the juvenile court's finding that it could not or should not place the children with Mother precluded return of the children to Mother's care and custody.

{¶ 84} Although Grandmother had been the legal custodian of the older children for more than eight years when they were committed to the temporary custody of the agency in 2023, Grandmother had never been the legal custodian of J.D. (age 5) or K.D. (age 4), the two youngest children. She had not filed a statement of understanding for legal custody with respect to those children, and there was nothing in the record to otherwise indicate that she was willing and able to assume legal custody of them.[13] Further, Morales testified that when she discussed the issue

---

[13] Citing R.C. 2151.353(A)(3), the agency argues that because Grandmother did not file a motion for legal custody, was not specifically identified in a motion for legal custody, and did not submit a statement of understanding for legal custody in these cases, not only could she not be granted legal custody of J.D. and K.D., but that "[t]he trial court lacked jurisdiction to consider granting [Grandmother] custody of [any of] the children."

Grandmother was granted legal custody of D.D., Sa.D., and St.D. in 2015 in Cuyahoga C.P. Juv. Nos. AD14913112, AD14913113, and AD14913114, and was the legal custodian of the children at the time the agency filed its complaint. There is nothing in the record to indicate that, prior to the juvenile court's September 3 and 4, 2025 permanent-custody orders — which explicitly terminated Grandmother's rights as legal custodian of D.D., Sa.D., and St.D. — she had permanently lost her status as the legal custodian of those children. Judgment entries from Cuyahoga C.P. Juv. Nos. AD14913112, AD14913113, and AD14913114, offered into evidence by the agency, show that Grandmother was granted legal custody of these children in those cases "upon the written motion" of the agency and that Grandmother had, at that time, signed a statement of

of reunification with Grandmother, Grandmother did not express a desire to have custody of all five children; rather, Grandmother informed Morales that she wished to reunify with the three oldest children.

{¶ 85} Because (1) J.D. and K.D. could not be placed with Mother given the juvenile court's finding the children cannot and should not be placed with Mother under R.C. 2151.414(E), (2) Father stipulated to the termination of his parental rights, and (3) no other suitable relative or interested persons had been identified with which to place the children, the only option for a legally secure permanent placement for J.D. and K.D. was permanent custody.

### b. D.D.

{¶ 86} D.D. was nearly 15 years old at the time of the hearing. Based on the evidence presented at the hearing and the report of the guardian ad litem, D.D. demonstrated sufficient maturity to meaningfully express her wishes regarding placement. The record reflects that D.D. had repeatedly and consistently stated — to her counsel, to the CCDCFS caseworkers, and to her guardian ad litem — that she did not want to return to Grandmother's care and preferred to be placed in the permanent custody of the agency. Whereas in Grandmother's care, she had faced housing insecurity, had been regularly embroiled in conflict and/or physical altercations with Mother, missed school frequently, and did not consistently engage

---

understanding for legal custody as to the children. Under the circumstances, it seems illogical that Grandmother would need to file another motion for legal custody or another statement of understanding for legal custody to continue as the children's legal custodian in these cases. Nevertheless, because the issue is not dispositive, we need not resolve it here. *See In re E.E.D.*, 2022-Ohio-4014, at ¶ 58, fn. 6 (8th Dist.).

in counseling, evidence was presented that D.D. was doing well in her current placement, that she felt safe in the foster home, that she had bonded well with her foster caregivers, that her behaviors had improved, and that she was attending counseling and school regularly. D.D.'s wishes were consistent with the recommendation of the guardian ad litem.

### c. Sa.D. and St.D.

{¶ 87} Sa.D. (age 13) and St.D. (age 12) both expressed a desire to return to Grandmother's custody. Although the juvenile court is required to consider child's wishes "as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child," R.C. 2151.414(D)(1)(b), a child's wishes are not determinative in assessing whether the granting of permanent custody is in the child's best interest.

{¶ 88} At the time of the hearing, St.D. was continuing to have issues with sexualized behaviors, he was still receiving inpatient treatment, and it was unknown when his treatment would be completed and he would be approved for release. At Genacross, St.D. received individual and group counseling, including specialized treatment for his sexualized behaviors. He regularly attended school and his behaviors were carefully monitored. Although Morales indicated that the services St.D. received at Genacross could be provided elsewhere if he were to return home, there were serious concerns whether St.D. would, in fact, receive the treatment he needed if he were returned to Grandmother's care. Evidence was presented that

St.D. posed a risk to the safety and well-being of other children and/or his disabled older brother if St.D. were to be returned home.

{¶ 89} The record reflects that Sa.D. had mental-health issues for which consistent counseling was essential for her well-being and that she was engaged in specialized treatment to address issues with her "acting out" and the trauma she had experienced. Whereas in Grandmother's care, Sa.D. had faced housing insecurity, failed to consistently attend school or engage in counseling, and faced issues of conflict, evidence was presented that in the security and structure of her placement, Sa.D.'s behaviors had improved, she was attending school and counseling regularly, she was able to communicate more openly with her caregivers to resolve issues, and conflict was reduced. Although the guardian ad litem acknowledged that a return of Sa.D. to Grandmother's care with protective supervision could be a possible outcome, she did not believe it would be in Sa.D.'s best interest, given Sa.D.'s history with Mother and all the existing concerns relating to Sa.D., for Sa.D. to be returned to a home shared by Mother and Grandmother "alone," without any of her other siblings.

### III. Conclusion

{¶ 90} This is a difficult case. Although Grandmother and the three oldest children and Mother and the two youngest children appear to share a genuine affection for, and bond with one another, we cannot say, based on the record before us, that the juvenile court erred in granting permanent custody of the children to the agency. The record shows the juvenile court made the requisite statutory

determinations, supported by clear and convincing evidence, in granting permanent custody to the agency. Following a thorough review of the record, having weighed the evidence and all reasonable inferences and having considered the credibility of the witnesses, we cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that its judgment must be reversed and a new trial ordered. *In re Z.C.*, 2023-Ohio-4703, at ¶ 14. Further, we cannot say that the juvenile court erred in denying Mother's motion for legal custody. Accordingly, we overrule Mother's assignments of error.

{¶ 91} Appeal No. 115622 dismissed; judgment affirmed.

It is ordered that appellee recover from appellants the costs herein taxed.

The court finds there were reasonable grounds for these appeals.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN T. GALLAGHER, JUDGE

LISA B. FORBES, P.J., and
ANITA LASTER MAYS, J., CONCUR